464 So.2d 721 (1985)
Terry A. CROMWELL, M.D.
v.
COMMERCE & ENERGY BANK OF LAFAYETTE and Fidelity National Bank of Baton Rouge.
Floyd J. BREAUX and Daniel G. Dupree
v.
FIRST NATIONAL BANK OF LAFAYETTE.
Bennett Boyd ANDERSON, Jr. et al.
v.
AMERICAN BANK & TRUST COMPANY OF LAFAYETTE et al.
Carl BAUER, et al.
v.
FIRST NATIONAL BANK OF LAFAYETTE et al.
William D. LONG
v.
SECURITY FIRST NATIONAL BANK.
No. 84-C-1104.
Supreme Court of Louisiana.
February 25, 1985.
Rehearing Denied April 11, 1985.
*722 Steven G. Durio, Mark C. Andrus, Durio, McGoffin & Andrus, Dennis L. Doise, Gary J. Russo, Onebane, Donohoe, Bernard, Torian, Diaz, McNamara & Abell, William E. Logan, Jr., P. Robert Viguerie, Jr., Logan & Viguerie, Lafayette, Henry H. Lemoine, Pineville, Henry C. Perret, Jr., Lafayette, for applicant-plaintiff.
Charles Kohlmeyer, Jr., William R. Forrester, Jr., Peter L. Koerber, Lemle, Kelleher, Kohlmeyer & Matthews, New Orleans; Michael H. Rubin, Steen, Rubin, Curry, Colvin & Joseph; John Dale Powers, Downing, Cazedessus & Powers, William C. Shockey, Gregory D. Frost, McCollister, McCleary, Fazio & Holliday; Susan H. Rouprich, Baton Rouge, Cliff Laborde, Laborde & LaFargue, H. Purvis Carmouche, Jr., Mouton, Roy, Carmouche, Bivins, Judice & Henke; Oscar Reed, Broadhurst, Brook, Mangham, Hardy & Reed, Ernest L. Parker, Bean & Parker, Lafayette, Robert Jackson, Baton Rouge, Aaron Frank McGee, Guillory, McGee, Mayeux & Fontenot, Eunice; Darrel D. Ryland, Marksville, Lee C. Kantrow, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge; John W. Munsterman, Gist, Methvin, Hughes & Munsterman, Alexandria, Winston Ardoin, Ardoin & Daigle, Eunice; Gene Broussard, New Iberia, for respondents.
DIXON, Chief Justice.
The plaintiffs in these consolidated cases seek reversal of the court of appeal decisions in which the court found that plaintiffs were not entitled to enjoin the defendant banks from paying on standby letters of credit issued by the banks. 450 So.2d 1. 450 So.2d 13. 450 So.2d 14. 450 So.2d 15. 450 So.2d 16. We affirm the court of appeal decision insofar as it denies injunctive relief.

FACTS
The plaintiffs in these five consolidated actions consist of the twenty-eight investors[1] who purchased limited partnership interests in Combined Investments, Limited (C.I., Ltd.), a Louisiana limited partnership. C.I., Ltd. was formed by Combined Equities, Incorporated (C.E., Inc.), a company engaged in the syndication and management of investment partnerships. C.E., Inc. was the general partner of C.I., Ltd.
As security for their capital contribution in C.I., Ltd., the limited partners were required to execute letters of credit in favor of C.I., Ltd. The letters of credit were issued by fourteen Louisiana banks.[2] The *723 issuing banks were sued by the plaintiffs in order to prevent the beneficiary from drawing on the letters of credit. The primary basis of plaintiffs' claim was alleged fraudulent activities on the part of C.E., Inc. and C.I., Ltd.
The final beneficiary of the letters of credit was European American Bank (EAB). EAB became the beneficiary under the letters of credit as security for a ten million dollar line of credit established in favor of C.I., Ltd. EAB intervened in these cases in order to assert its right to draw on the letters of credit.
In addition to EAB, several other parties intervened in these cases to assert their interests. C.E., Inc., and C.I., Ltd. intervened in order to refute the plaintiffs' claim that they defrauded the plaintiff-investors. American Bank & Trust Company of Baton Rouge and American Bank & Trust Company of Lafayette intervened to oppose the plaintiffs' claim.[3]
The formation of C.I., Ltd. began on June 1, 1981, when C.E., Inc. commenced offering partnership units in C.I., Ltd. C.E., Inc. had been in the business of syndicating partnerships since its formation in 1976. C.E., Inc. and its affiliated companies derived their income from fees charged for a variety of managerial and financial services provided to limited partnerships.
Prior to the creation of C.I., Ltd., the C.E., Inc. staff prepared a Private Placement Memorandum (PPM), a two hundred twenty page document which detailed the proposed structure of C.I., Ltd. and listed the terms of the partnership offering. All of the limited partners received a copy of the PPM prior to their investment in C.I., Ltd. The PPM included financial information and historical data concerning the general partner (C.E., Inc.) as well as a series of closing documents which were to be completed by each investor.
The closing documents were comprised of a series of forms to be completed by the investors. One of the purposes of the closing documents of the PPM was to require each investor to appoint an experienced investment advisor ("offeree representative") to review the PPM and advise him concerning the risks of the offering. The investors were each required to provide detailed information regarding their personal finances. Each investor was required to warrant that he was financially able to bear the risks of an investment in C.I., Ltd.
According to the PPM, the partnership's primary objectives were to acquire, transfer and invest in real estate in order to generate cash flow and to obtain long term capital gains. It was also the intention of C.I., Ltd. to secure significant tax advantages for the limited partners. These tax savings were to be obtained by passing through many of C.I., Ltd.'s losses onto the limited partners.
The PPM also indicated that C.I., Ltd. was a "blind pool" offering, since at the time of the offering the partnership did not own any property nor did it intend to acquire any specific property. The risks of such an offering were described in the PPM:
"RISK OF UNSPECIFIED INVESTMENTS
The proceeds of this Offering are intended to be invested in Properties which have not yet been selected. There can be no assurance as to if or when the proceeds from the Offering will be fully invested. Pending investment of Limited Partners' capital contributions, the General Partner is not required to invest Partnership funds in any particular manner *724 and during such period investors will not have the opportunity to earn any return on such contributions. Persons who purchase Units will not have an opportunity to evaluate for themselves the specific Properties in which funds of the Partnership will be invested or the terms of any such investments and, accordingly, the Limited Partners must depend solely upon the General Partner with respect to the selection of investments...." PPM, p. 27.
Originally the syndication of C.I., Ltd. was intended solely to be accomplished through the sale of up to one hundred limited partnership interests. The purchase price of each unit was $250,000. In order to pay this sum, each limited partner was required to contribute $20,000 in cash, a two year, non-interest bearing demand note for $30,000, and a demand note for $200,000. Each investor was also required to obtain a $200,000 standby letter of credit, securing the $200,000 note.
The highly leveraged terms of the capital contribution allowed the limited partners to obtain significant tax advantages. The federal tax laws allow limited partnerships to pass through losses to their limited partners, based on the amount of the partner's money "at risk." Under the C.I., Ltd. proposal, each partner had $250,000 at risk in spite of the fact that his initial cash investment was only $20,000. During 1981 the partnership passed along a $76,000 tax loss to each investment unit.
Thirty-nine units in C.I., Ltd. were sold and the partnership officially came into existence on September 23, 1981. By the end of November, 1981 all plaintiffs except one had purchased interests; the last purchase was April 13, 1982.
In accordance with the terms of the capital contribution, each plaintiff secured a $200,000 letter of credit from his bank. The letters of credit were all issued in accordance with a form included in the closing package of the PPM. That form provided:

"(LETTERHEAD OF BANK)

ADDRESS

(Date)

Irrevocable Letter of Credit
Combined Investments, Ltd., a
Louisiana Limited Partnership
5551 Corporate Boulevard
Suite 3-A
Baton Rouge, Louisiana
Dear Sirs:
We hereby open our Irrevocable Letter of Credit in your favor for the account of (Name of Investor) (Address of Investor), for a sum or sums not exceeding in the aggregate the sum of Two Hundred Thousand and No/100 ($200,000.00) Dollars, available by your drafts drawn on (Bank), (Address of Bank), at sight to be accompanied by:
An Affidavit signed by an officer of the holder of this Letter of Credit certifying that a default exists under
(i) any loan of Combined Investments, Ltd., a Louisiana Limited Partnership, due such holder, or
(ii) any indebtedness of (Name of Investor) due such holder,
which this Letter of Credit may secure.
Drafts must be drawn and negotiated on or before July 1, 1982, on which date this Letter of Credit expires. This Letter may be drafted against in full without being accompanied by the Affidavit referred to above from June 1, 1982 until July 1, 1982 if this Letter of Credit is not renewed by June 1, 1982 for a period of one year expiring July 1, 1983 in the face amount of $200,000 and in a form acceptable to the Beneficiary, its transferees or assigns.
The right to draw under this Letter of Credit is, by the holder hereof, absolutely irrevocable and unconditional (except as set forth herein) and is transferable and/or assignable in whole or in part.
Each draft must be marked `Drawn under (Bank) , (Address of Bank), Letter of Credit Number ______, Dated _______, 19____', and the amount *725 of each draft so drawn endorsed by the negotiating bank. The final draft drawn under this Letter of Credit must be accompanied by this Letter of Credit. This credit is subject to the Uniform Customs and Practice for Documentary Credits, 1974 Revision, fixed by the International Chamber of Commerce Brochure No. 290.
We hereby agree with Drawers, Endorsers and Bona Fide Holders of Drafts drawn under and in compliance with the Credit that the same shall be duly honored upon presentation to the Drawee Bank as specified above.

Sincerely,

(NAME OF BANK)

By: ______

By: ______
(NOTE: NEED SIGNATURES OF TWO (2) BANK OFFICERS)" PPM Closing Documents, Form 3-A.
The limited partners' letters of credit were intended to be used to secure bank financing for C.I., Ltd. The original letter of credit named C.I., Ltd. as beneficiary. In order to secure financing, the letters of credit were to be transferred to lending banks.
After its formation in September, 1981, C.I., Ltd., acting through its general partner, negotiated loans from Mercantile National Bank of Dallas and First National Bank of Lafayette. The Mercantile loan was for 5.4 million dollars and the First National loan was for 2.4 million dollars. In order to secure the loans, the letters of credit were transferred to the banks along with security interests in the demand notes. As further security for the financing, C.I., Inc. and two of its principal officers, Robert Jackson and E. Hardy Swyers, guaranteed payment of the loans.
The proceeds of the Mercantile and First National loans were used primarily to invest in other limited partnerships which were related to C.E., Inc. These affiliated partnerships generally owned real estate interests such as condominiums, hotels and apartments. Some of these investments were in the form of loans to the other limited partnerships.
C.I., Ltd.'s first contact with EAB took place in September, 1981. Representatives of EAB and C.E., Inc. met to discuss the establishment of a line of credit which would replace the Mercantile and First National loans. Through the consolidation of the prior loans with EAB, C.E., Inc. hoped to obtain a lower interest rate on its outstanding debt.
Subsequent meetings and discussions led to EAB's approval of a 10 million dollar line of credit for C.I., Ltd. The loan agreement was signed on March 15, 1982. Prior to the approval of the line of credit, EAB conducted an investigation into the credit worthiness of C.I., Ltd. and lengthy negotiations took place between EAB and C.I., Ltd.
EAB's primary representative throughout the negotiation process was Dennis Devito, the assistant vice president in charge of partnership lending. Devito first learned of C.E., Inc. on September 2, 1981 when he was contacted by Alan Jacobs, a New York attorney who was representing C.E., Inc. As a result of his discussions with Jacobs, Devito requested that C.E., Inc. forward the PPM of C.I., Ltd. to the bank.
On September 16, 1981 a meeting took place between representatives of EAB and C.I., Ltd. at the offices of EAB in New York. Devito, Jerold Frier, EAB's vice president, and Harvey Horowitz, a member of the partnership lending division, represented EAB at the meeting. C.E., Inc. was represented at the meeting by Alan Jacobs, E. Hardy Swyers, vice chairman of the board, and Gil Guidry, bank financing manager. The structure of C.I., Ltd. and the possibility of a 20 million dollar credit facility were discussed at the meeting. Subsequent to that meeting, Devito prepared a preliminary loan memorandum and went ahead with the loan approval process.
On September 22, 1981 Devito and Alan Churchill, EAB's vice president of real estate *726 advisory services, made a day long trip to C.E., Inc. headquarters in Baton Rouge. The purpose of the meeting was for Devito and Churchill to familiarize themselves with the operation of C.E., Inc. and to meet its officers. Churchill went along on the trip because of his experience with real estate loans. A file memo written by Devito, which was introduced at trial, indicates that Churchill was satisfied with the operation of C.E., Inc.
Subsequent to the initial meetings, C.I., Ltd. sent a variety of financial data and other information concerning C.I., Ltd. and C.E., Inc. to EAB. One of the documents received by EAB was a portfolio of C.E., Inc., dated September, 1981, which gave specific details concerning the management of C.E., Inc. and its investments. Audited financial statements of C.E., Inc. for the fiscal year ending March 31, 1981 were also sent to EAB.
The bank conducted a credit reference check of C.E., Inc. by contacting five banks and three certified public accountants that had done business with C.E., Inc. The banks, except for Capital Bank & Trust Company, Baton Rouge, indicated that their relationship with C.E., Inc. was very satisfactory. Capital Bank indicated that it had increased its line of credit with C.E., Inc. due to cash flow problems. The accountants contacted by EAB recommended C.E., Inc. as a client.
After reviewing the information furnished by C.I., Ltd. and the credit references, an "internal offering memorandum" was prepared by Devito. This memorandum consisted of a loan proposal for a 10 million dollar credit facility to be secured by letters of credit of the limited partners of C.I., Ltd. The memorandum also included an in-house appraisal of C.I., Ltd. and its general partner. The final paragraph of the memo set forth a recommendation in favor of approval of the C.I., Ltd. loan. This recommendation was primarily based upon the fact that the loan was to be secured by irrevocable letters of credit naming the bank as beneficiary.
The inter-office memo was approved by the bank on October 30, 1981. The bank's approval of the loan on that date was followed by several months of delay before the actual signing of the loan agreement on March 15, 1982. During that interval, EAB and C.I., Ltd. negotiated with regard to the language of the final loan agreement.
On December 10, 1981 EAB sent a proposed loan agreement to C.E., Inc. for review. On December 11, Robert Jackson, the chairman of C.E., Inc. and Glenn Bodin, the senior vice president of C.E., Inc., had dinner with Churchill and Devito to discuss the terms of the loan agreement.
On December 17, 1981 Churchill sent out an internal memo to Devito which stated that: "As of 2:30 today, no commitment of any kind should be made to Combined Equities prior to my review and approval." Churchill circulated the memo after hearing from a confidential source that C.E., Inc. was slow in its payment of a loan. Devito subsequently met with Churchill and on December 18 Churchill released his hold on the commitment to C.I., Ltd.
In response to Churchill's concerns, Devito contacted Capital Bank in Baton Rouge on December 19 to inquire about the credit worthiness of C.E., Inc. Keith Miller, the vice president of Capital Bank, indicated to Devito that the bank's overall relationship with C.E., Inc. was satisfactory but that C.E., Inc. was experiencing some cash flow difficulties. Miller indicated that these problems were the result of the fast growth of C.E., Inc., the delayed closing of real estate syndications and the fact that the cash of C.E., Inc. was not consolidated at a single bank. He also stated that C.E., Inc. was attempting to address these problems.
On January 25, 1982 EAB received a set of financial statements for C.E., Inc. and its subsidiaries. The most recent statements were for the year ending March 31, 1981. Those statements revealed that C.E., Inc. owned assets of $5,904,708 and that it sustained a net loss of $990,913. Devito attributed this loss to the seasonal nature of the real estate syndication business. He *727 also testified that the March 31, 1981 statements of C.E., Inc. were just one set of many financial statements relied on in approving the credit facility.
EAB sent an amended draft of the loan agreement to C.E., Inc. on February 26, 1982. This amended version incorporated several changes which had been requested by C.E., Inc.
The loan agreement was finally signed on March 15, 1982 in New Orleans. Dwayne Broussard, C.E., Inc.'s legal counsel, and Gil Guidry were present at the signing on behalf of C.I., Ltd. Devito signed on behalf of EAB. Immediately prior to the signing of the agreement, four changes to the loan agreement were "penciled" in at the request of the C.E., Inc. representatives. The plaintiffs attach significance to a change made with regard to the guarantees of Robert Jackson and C.E., Inc. Prior to the change, the last sentence of § 2.06 provided: "The bank will only call on the Guarantees after having drawn under the Letters of Credit." The following phrase was added to that sentence at the time of the signing: "and only upon the failure or inability of the issuing bank to make payment under the terms of the Letters of Credit."
Following the consummation of the loan, the limited partners were contacted by C.I., Ltd. and advised to have new letters of credit issued naming EAB as beneficiary. This reissuance was accomplished by having new letters of credit issued in favor of C.I., Ltd. and then transferring those letters of credit to EAB. EAB contacted Mercantile National Bank of Dallas and First National Bank of Lafayette regarding payment of the prior loans. Those banks were instructed to cancel the letters of credit which they held. Upon the receipt of the new letters of credit, EAB paid off the Mercantile and First National loans with the proceeds of the new credit facility.
EAB placed C.I., Ltd. in default in September, 1982. On November 24, EAB drew drafts on the issuing banks for payment under the letters of credit. The plaintiffs sought and obtained a temporary restraining order which enjoined the issuing banks from honoring the drafts by EAB. A hearing was subsequently held after which the trial judge granted a preliminary injunction preventing honor of the drafts. The court held that the plaintiffs were entitled to injunctive relief under R.S. 10:5-114(2) since there was "fraud in the transaction."
The trial court based its holding of fraud on the acts of C.E., Inc. while acting as the general partner of C.I., Ltd. The court found that C.E., Inc. had disregarded the provisions of the PPM in making investments for C.I., Ltd. Also, the court found that C.E., Inc. did not fulfill its representation in the PPM that it would provide up to 5 million dollars in the event of negative cash flow for C.I., Ltd.
The court found that EAB had knowledge of these facts constituting fraud and therefore knew or should have known of the fraud being perpetrated on the investors. Therefore, the court found that EAB made the loan in bad faith. For these reasons, EAB was prohibited from drafting under the letters of credit.
The court of appeal reversed, holding that no fraud occurred within the intendment of R.S. 10:5-114(2). Therefore, injunctive relief was denied. The court found that the trial court erroneously concluded that EAB committed a fraud. The court did not decide whether C.E., Inc. had acted fraudulently since under its interpretation of R.S. 10:5-114, such fraud would not have been grounds for an injunction against the issuing banks.
The plaintiffs sought writs from this court to have the trial court judgment reinstated. They claim that the court of appeal erroneously overturned the factual findings of the trial court, misconstrued the meaning of "fraud in the transaction" and erroneously accorded EAB rights greater than those of C.I., Ltd.

ISSUES
In order to determine whether the issuing banks may be enjoined from paying *728 under the letters of credit, the following issues must be decided:
1. What is the meaning of "fraud in the transaction," in R.S. 10:5-114(2), as applied to standby letters of credit which are used to secure bank financing?
2. Whether such fraud occurred in this case, entitling plaintiffs to the injunctive relief provided for in R.S. 10:5-114(2)(b)?
The right to enforce payment of drafts issued under a letter of credit is governed by R.S. 10:5-114, which provides:
"(1) An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary. The issuer is not excused from honor of such a draft or demand by reason of an additional general term that all documents must be satisfactory to the issuer, but an issuer may require that specified documents must be satisfactory to it.
(2) Unless otherwise agreed when documents appear on their face to comply with the terms of a credit but a required document does not in fact conform to the warranties made on negotiation or transfer of a document of title or of security or is forged or fraudulent or there is fraud in the transaction.
(a) the issuer must honor the draft or demand for payment if honor is demanded by a negotiating bank or other holder of the draft or demand which has taken the draft or demand under the credit and under circumstances which would make it a holder in due course and in an appropriate case would make it a person to whom a document of title had been duly negotiated or a bona fide purchaser of a security; and
(b) in all other cases as against its customer, an issuer acting in good faith may honor the draft or demand for payment despite notification from the customer of fraud, forgery or other defect not apparent on the face of the document but a court of appropriate jurisdiction may enjoin such honor.
(3) Unless otherwise agreed an issuer which had duly honored a draft or demand for payment is entitled to immediate reimbursement of any payment made under the credit and to be put in effectively available funds not later than the day before maturity of any acceptance made under the credit."
Since the issues of this case are res nova in Louisiana, it is necessary to briefly define the letter of credit and examine its background and commercial significance.
"A letter of credit is a written engagement by the issuer, usually a bank, to honor demands for payment which comply with the terms of the credit. A letter of credit involves at least three parties: the party requesting that the letter of credit be issued (customer); the party issuing the letter of credit (issuer); and the party in whose favor the letter of credit is issued (beneficiary)." (Footnotes omitted). Hawkland & Holland, UCC Series § 5-101:02 (Art 5).
Traditionally, letters of credit have been used to finance international sales transactions. When used in this conventional fashion the credit is often designated a "commercial" letter of credit.
In a typical sale of goods transaction, involving a commercial letter of credit, the buyer (customer) requests his bank (issuer) to issue a letter of credit in favor of the seller (beneficiary). The seller/beneficiary is then entitled to draw on the letter of credit upon presentment of certain documents. The documentary evidence submitted to the issuing bank, such as a bill of lading, is proof that the goods have been shipped by the seller.
The fundamental purpose of the letter of credit in the commercial context is to assure the seller/beneficiary that he will be paid for his goods. Without the letter of credit, the international seller might only have the buyer's promise as an assurance of payment. The letter of credit allows the seller to replace the customer's obligation to pay with the commitment of a bank to pay drafts under the letter of credit.
*729 The letter of credit is separate and distinct from the underlying transaction. Therefore, the issuer's duty to honor properly documented drafts is unrelated and independent of the underlying obligation. This rule of independent contracts, sometimes referred to as the "independence principle," is embodied in R.S. 10:5-114(1), which provides that:
"An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary...."
Courts throughout the country have consistently applied the independence principle to letter of credit transactions. The reasoning behind the courts' strict application of the independence rule is accurately stated in Intraworld Industries, Inc. v. Girard Trust Bank, 461 Pa. 343, 336 A.2d 316, 323 (1975):
"The great utility of letters of credit flows from the independence of the issuer-bank's engagement from the underlying contract between beneficiary and customer. Long-standing case law has established that, unless otherwise agreed, the issuer deals only in documents. If the documents presented conform to the requirements of the credit, the issuer may and must honor demands for payment, regardless of whether the goods conform to the underlying contract between beneficiary and customer. Absent its agreement to the contrary, the issuer is, under the general rule, not required or even permitted to go behind the documents to determine if the beneficiary has performed in conformity with the underlying contract." (Citations omitted).
In recent years, the letter of credit has been extended beyond its traditional usage in the sale of goods context. One of these applications has been labeled a "guarantee" or "standby" letter of credit. The letters of credit obtained by the plaintiffs were standby letters of credit. The standby letter of credit has been utilized extensively to secure bank financing for business ventures. In this context the letter of credit guarantees the repayment of a loan.
When used to secure bank financing, the standby credit differs from the commercial credit in several respects. First, the event which triggers payment in the standby situation is a default on the underlying loan. The customer knows that the standby letter of credit will not be drawn on unless there is troubleusually default on a loan made by the beneficiary. In contrast, the commercial credit is triggered by the shipment of goods and the presentation of documents which verify the shipment. A second difference exists with regard to the beneficiary under the credit. In the commercial context, the seller is the beneficiary and he has the corresponding right to draw on the letter of credit. In contrast, when the credit secures a loan, the lending bank is the beneficiary.
There are several reasons why lending banks find it desirable to utilize letters of credit to secure the repayment of loans. First, the credit transfers the responsibility of payment from the customer to the issuing bank. Thus, the lending bank is assured payment unless the issuing bank becomes insolvent. Second, the credit is thought to offer an expeditious means of obtaining payment after default on a loan. Upon default, the lending bank merely submits affidavit evidence that the default occurred, and it may then draw on the standby letter of credit.
In recent years the standby letter of credit has emerged as a unique financial device capable of accomplishing a variety of guaranty functions. Cf. Paster v. National Republic Bank of Chicago, 76 Ill.2d 139, 28 Ill.Dec. 535, 538, 390 N.E.2d 894, 897 (Ill.1979); Verkuil, Bank Solvency and Guaranty Letters of Credit, 25 Stan.L.R. 716, 721 (1973). Although the U.C.C. provisions were primarily intended to focus on commercial letters of credit, the drafters intended for the Code to permit such novel applications. R.S. 10:5-101, U.C.C. Comment 1; R.S. 10:5-102, U.C.C. Comment 2. R.S. 10:5-102(3) provides that the letter of *730 credit provisions in Chapter 5 are not intended to inhibit the future development of the laws governing letters of credit. Therefore, in deciding cases involving novel applications of letters of credit, we are authorized to consider the manner in which the courts of our sister states have decided such cases.

FRAUD IN THE TRANSACTION
The primary issue in this case is the interpretation of "fraud in the transaction" in R.S. 10:5-114. Under that provision, the issuing banks must honor EAB's drafts unless the documents presented by EAB were "... forged or fraudulent or there is fraud in the transaction." R.S. 10:5-114(2). The plaintiffs do not dispute the validity of the documents submitted by EAB. Therefore, the only issue is whether there was "fraud in the transaction." If such fraud is found to exist, a court is empowered, under R.S. 10:5-114(2)(b), to enjoin the issuing banks from honoring drafts under the credit.
There is more than one "transaction" involved when letters of credit are issued. The first is the contract between the customer and the issuing bank, present in all cases; the conventional case involves a sale and delivery of goods; the standby case involves a contract or performance, or a loan by the beneficiary bank to a borrower, secured by the customer's letter of credit. If the credit secures a loan by the beneficiary bank, that loan is the underlying transaction.
The plaintiffs maintain that "transaction" should be interpreted in its broadest sense. It is their position that by not qualifying "transaction," the drafters intended it to be given a very general and expansive interpretation. More specifically, they claim that "if a fraud is practiced that would ultimately cause a loss to the customer, injunction will lie against honor regardless of who perpetrated the fraud."
Furthermore, they contend that "transaction" must be understood to include the underlying transaction between the limited partners and C.I., Ltd. Plaintiffs maintain that by not giving transaction a general meaning, lending banks would be permitted to "launder fraud," thereby damaging the integrity of the judicial system.
The intervenors advocate a restrictive interpretation of "transaction." They claim that an injunction may be properly issued only when fraudulent documents are issued, or when the beneficiary commits active fraud against the investors who obtained the letters of credit.
The U.C.C. was adopted in Louisiana in an effort to harmonize the commercial law of Louisiana with that of the other states.[4] We should, therefore, examine the jurisprudence of other states interpreting R.S. 10:5-114(2).[5]
The most frequently cited case on the "fraud in the transaction" exception in U.C.C. 5-114(2) is Sztejn v. Henry Schroder Banking Corp., 177 Misc. 719, 31 N.Y. S.2d 631 (Supr.Ct.N.Y.1941). Although Sztejn arose before the drafting of the U.C.C., most commentators and courts agree that Sztejn was the impetus for the fraud exception.
Sztejn involved a commercial letter of credit issued by J. Henry Schroder Banking Corporation in favor of Transea, an Indian corporation which sold bristles. The New York plaintiff, Sztejn, and his co-adventurer, Schwartz, had contracted to purchase bristles from Transea. They obtained a letter of credit from Schroder Banking Corporation in order to pay for the bristles. The letter of credit provided that Transea could draw on it upon presentment of an invoice and a bill of lading.
*731 After placing fifty cases on a ship bound for the United States, Transea presented a bill of lading and an invoice to the Chartered Bank of India, a correspondent bank of J. Henry Schroder Banking Corporation. The documents represented that fifty crates of bristles had been shipped, but in fact the crates contained cow hair and rubbish, according to the plaintiff's petition. Plaintiff sued to enjoin the Chartered Bank of India from honoring Transea's drafts.
The defendant, Chartered Bank of India, filed a motion to dismiss for failure to state a cause of action. Accepting the plaintiff's allegations as true, the New York court denied the motion to dismiss. The court concluded that J. Henry Schroder Banking Corporation had received notice of an active fraud by Transea before presentment of the draft for payment. The court reasoned that:
"In such a situation, where the seller's fraud has been called to the bank's attention before the drafts and documents have been presented for payment, the principle of the independence of the bank's obligation under the letter of credit should not be extended to protect the unscrupulous seller." 31 N.Y.S.2d at 634.
In spite of its decision in favor of the plaintiff, the court was careful to leave the independence principle intact:
"It is well established that a letter of credit is independent of the primary contract of sale between the buyer and the seller. The issuing bank agrees to pay upon presentation of documents, not goods. This rule is necessary to preserve the efficiency of the letter of credit as an instrument for the financing of trade. One of the chief purposes of the letter of credit is to furnish the seller with a ready means of obtaining prompt payment for his merchandise. It would be a most unfortunate interference with business transactions if a bank before honoring drafts drawn upon it was obliged or even allowed to go behind the documents, at the request of the buyer and enter into controversies between the buyer and the seller regarding the quality of the merchandise shipped. If the buyer and the seller intended the bank to do this they could have so provided in the letter of credit itself, and in the absence of such a provision, the court will not demand or even permit the bank to delay paying drafts which are proper in form.... Of course, the application of this doctrine presupposes that the documents accompanying the draft are genuine and conform in terms to the requirements of the letter of credit...." (Citations omitted). 31 N.Y.S.2d at 633-34.
The Sztejn court, in determining whether the customer could stop the issuing bank from honoring the draft, determined that the underlying transaction was fraudulent and that the Chartered Bank (presenting the draft for payment on behalf of Transea) was in no better position than the fraudulent Transea.
Sztejn was a commercial letter of credit case which involved active fraud on the part of the beneficiary. The bank (Chartered) that presented the draft for payment was merely the correspondent for the issuing bank, not a holder in due course, but an agent of the seller-beneficiary charged with fraud. The court refused to allow a sellerbeneficiary to profit from its own fraudulent conduct.
The Sztejn holding was applied to standby letters of credit in Shaffer v. Brooklyn Park Garden Apartments, 311 Minn. 452, 250 N.W.2d 172 (Minn.1977). In Shaffer, two purchasers of units in a limited partnership had letters of credit issued in favor of the limited partnership as part of their capital contribution. The letters of credit provided they could be drawn on only after presentment of a promissory note and a certification by the partnership that the investors had failed "to meet payment of authorized loans which are payable." 250 N.W.2d at 175. The letters of credit were subsequently transferred to Wayzata Bank & Trust Company as security for loans to the partnership.
The partnership experienced financial difficulty and Wayzata Bank & Trust Company *732 attempted to draw on the letters of credit. In compliance with the letters of credit, Wayzata presented notes and certifications by the partnership that the investors had failed "to meet payment of authorized loans which are payable."
The investors sued to enjoin Wayzata from drawing on the letters of credit, claiming that the certifications were false. The court found that an injunction was proper because plaintiffs sought the injunction on the basis of fraud in the documentation. The court reasoned that:
"... [W]here injunctive relief is sought, the fraud alleged must be in respect to the documents presented and not as to the underlying transaction. The allegations of fraud made by [the plaintiff-investors] is appropriate for injunctive relief since it concerns the certifications by [the partnership] presented by Wayzata." 250 N.W.2d at 180.
Another standby letter of credit situation was faced in O'Grady v. First Union National Bank, 296 N.C. 212, 250 S.E.2d 587 (1978). In that case, the attachment of a letter of credit to a note it purported to secure, but which had been substituted for the original note and which omitted the signature of one endorser was interpreted by the court as a case involving "fraudulent documentation" which would give rise to injunctive relief. Plaintiffs before us interpret the case as involving fraud "in the underlying transaction."
In Colorado National Bank of Denver v. Board of County Commissioners of Routt County, 634 P.2d 32 (Colo.1981), Routt County sued to enforce a standby letter of credit issued in its favor by a land developer, apparently as security for the developer's promise to build certain roads in a proposed subdivision in the mountains. The development was apparently abandoned, and the land remained raw, undeveloped mountain property for which there was no market and for which the county had no plans to improve.
The issuing banks refused to honor the drafts and the county sued the banks. The banks resisted by claiming that the county's recovery would constitute a "windfall." They alleged that such a "windfall" recovery fell within the "fraud in the transaction" exception.
The Colorado Supreme Court upheld the county's right to collect under the letters of credit, rejecting the bank's fraud claim. The court relied on the independence principle and refused to allow the issuing bank to litigate the performance of the underlying contract. According to the court:
"The Bank cannot litigate the performance of the underlying performance contracts. `[P]erformance of the underlying contract is irrelevant to the Bank's obligations under the letter of credit.' ... Likewise, the question of whether the beneficiary of the letter of credit has suffered any damage by the failure of the bank's customer to perform as agreed is of no concern.... Further, a bank cannot challenge the utilization of funds paid under a letter of credit.... (Citations omitted)
. . . . .
Fundamentally, `fraud in the transaction,' as referred to in section 4-5-114(2), must stem from conduct by the beneficiary of the letter of credit as against the customer of the bank. See generally White and Summers, Uniform Commercial Code & sect; 18-6 (2d ed. 1980). It must be of such an egregious nature as to vitiate the entire underlying transaction so that the legitimate purposes of the independence of the bank's obligation would no longer be served. Intraworld Industries, Inc. v. Girard Trust Co., supra; New York Life Insurance Co. v. Hartford National Bank & Trust Co., 173 Conn. 492, 378 A.2d 562 (1977); Sztejn v. Henry Schroder Banking Corp., supra; Werner v. A.L. Grootemaat & Sons, Inc. [80 Wis.2d 513, 259 N.W.2d 310 (1977)] supra. `[I]t is generally thought to include an element of intentional misrepresentation in order to profit from another....' West Virginia Housing Development Fund v. Sroka [415 F.Supp. 1107 (1976)], supra. This fraud is manifested in the documents *733 themselves, and the statements therein, presented under the letter of credit. Dynamics Corporation of America v. Citizens & Southern National Bank [356 F.Supp. 991 (1973)], supra; Shaffer v. Brooklyn Park Garden Apartments, 311 Minn. 452, 250 N.W.2d 172 (1977)...." 634 P.2d at 39-40.
The Colorado Supreme Court noted that the issuing bank did not even argue that there was fraud in the transaction between the developer (customer) and the county (beneficiary) and agreed with the trial court's decision to exclude "all evidence beyond the four corners of the letters of credit, the demands thereunder, and the Bank's replies." 634 P.2d at 40.
Finally, in Cappaert Enterprises v. Citizens and Southern International Bank of New Orleans, 486 F.Supp. 819 (E.D.La. 1980), plaintiff, Cappaert Enterprises, sued to enjoin a Kuwait bank from collecting under a letter of credit which was issued to secure a loan. The letter of credit was obtained by a joint venture comprised of Cappaert and United Fisheries of Kuwait. A dispute developed between Cappaert and United concerning performance of the joint venture agreement. Cappaert sued to enjoin the Kuwait bank from drawing on the letter of credit, claiming that United had committed a fraud against it.
The district court concluded that Cappaert's claim of "fraud in the transaction" was without merit. The court relied heavily on the principle of independence between the letter of credit and the underlying transaction. According to the court:
"The accuracy of Cappaert's allegation that United Fisheries acted fraudulently in its role as a joint venturer is immaterial to the resolution of this issue, for impropriety in the underlying agreement is irrelevant to an interpretation of the letter of credit...." 486 F.Supp. at 826.
As illustrated in the foregoing cases the independence principle is a strong influence in the decision of cases throughout the country. Adherence to that basic principle is necessary in order to protect the commercial utility of letters of credit.
Nevertheless, the jurisprudence and literature recognize and illustrate the need to extend the meaning of "fraud in the transaction" at least a step beyond fraudulent documentation. The strongest reason for such an extended interpretation is to deny rewarding fraudulent conduct by letter of credit beneficiaries. One author writes:
"Notwithstanding dictum to the contrary in some of the cases, the holding of the court in NMC Enterprises, Inc. v. Columbia Broadcasting System, Inc. that fraud in the underlying transaction is sufficient to justify relief is the better rule. Since the issuer's obligation on a letter of credit is generally completely independent of the underlying transaction, the customer who obtains a letter of credit assumes the risk that payment may be made when the beneficiary has not properly performed the underlying contract. Moreover, the beneficiary may have required the letter of credit in part to assure that a dispute regarding performance of the underlying contract would not delay payment. By obtaining a letter of credit, however, the customer should not be required to assume the risk of making payment to a beneficiary who has engaged in fraudulent conduct in the underlying transaction. Furthermore, a rule that precludes injunctive relief where the fraud is in the underlying transaction will compensate the beneficiary for wrongful acts in situations where the customer will not have an effective legal remedy for the fraudulent conduct and thus tend to encourage fraud, a policy that should be avoided. As the court said in Dynamics Corp. of America v. Citizens & Southern Nat. Bank, there is as much public interest in discouraging fraud as in encouraging the use of letters of credit.

While fraud in the underlying transaction should be sufficient to justify injunctive relief, mere failure to properly perform the underlying contract does not constitute fraud...."
(Emphasis added). Hawkland & Holland, UCC Series § 5-114.09 (Art 5).
*734 In the case before us, the "underlying transaction" is the loan transaction between EAB and C.I., Ltd. If the beneficiary EAB was guilty of fraud with respect to the plaintiffs (investors/customers), it should not be permitted to profit from that fraud.
If the banks want an instrument which will be paid without question upon demand, with no recourse by parties upon whom responsibility lies, other means are available.
Our holding is consistent with the cases cited by the parties as well as those found by our research. In all of the cases where letters of credit have been enjoined, the courts have found that either the documents were defective or the beneficiary was guilty of fraud.[6] For example, in Sztejn, the customer sought to enjoin the payment of a draft, presented by the agent of the fraudulent beneficiary, at a time after the issuing bank had notice of the fraudulent shipment by the beneficiary.
Under the foregoing interpretation of "fraud in the transaction," it must now be decided whether such fraud occurred in this case. In accordance with our interpretation of R.S. 10:5-114(2), our analysis will be limited to the loan transaction and the conduct and knowledge of the beneficiary, EAB.
There is more than one measure of "fraud" in the various jurisdictions in the United States.
Cases and writers have called Sztejn an example of "egregious" fraud, and some have required "egregious" fraud in the transaction before according relief to the customer. (KMW International v. Chase Manhattan Bank, 27 UCC Rep 203, 606 F.2d 10 (CA2 1979); Colorado National Bank of Denver v. Board of County Commissioners of Routt County, supra).
Cases and authorities have distinguished "egregious" fraud from "intentional" fraud, and have advocated "intentional" fraud as the better standard to afford injunctive relief to the customer. Hawkland & Holland UCC Series § 5-114:09 (Art 5).
Civil Code provisions defining fraud and the rights of the fraud victim establish standards for commercial transactions in Louisiana and would seem to require the same results reached in most of the fraud cases involving letters of credit.
"Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction." C.C. 1953. "Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.
The exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations." C.C. 1954.
"Error induced by fraud need not concern the cause of the obligation to vitiate consent, but it must concern a circumstance that has substantially influenced that consent." C.C. 1955.
"Fraud committed by a third person vitiates the consent of a contracting party if the other party knew or should have known of the fraud." C.C. 1956.
"Fraud need only be proved by a preponderance of the evidence and may be established by circumstantial evidence." C.C. 1957.
"The party against whom rescission is granted because of fraud is liable for damages and attorney fees." C.C. 1958.
*735 Plaintiffs maintain that EAB obtained knowledge of fraudulent practices in its investigation of C.E., Inc. and C.I., Ltd. The trial court agreed with plaintiffs and found that the entire letter of credit transaction was permeated with fraud; the court also found that EAB had notice of the fraud. Such findings, if supported by the evidence, would warrant injunctive relief under our interpretation of R.S. 10:5-114.
The trial court relied on several factual findings in reaching its determination that "fraud in the transaction" occurred. The first finding relied on by the trial court was that the principals of C.E., Inc. made oral representations to the plaintiffs that C.I., Ltd. was going to invest directly in real estate. Contrary to these representations, C.I., Ltd. invested primarily in other partnerships. These representations have no relevance to the conduct of EAB since they were not written and it was not shown that EAB knew about them.
Secondly, the trial court found that EAB had knowledge of cash flow problems at C.E., Inc. This finding is supported by the testimony of Devito and the December 17, 1981 memo which placed the loan on hold. In spite of this knowledge, it is undisputed that EAB had received a significant number of positive recommendations concerning C.E., Inc.'s ability to pay its debts. It cannot be said that EAB's knowledge that a cash flow problem had existed constitutes fraud.
According to the trial court, the PPM misrepresented that C.E., Inc. could fund five million dollars of capital to C.I., Ltd. The PPM stated that C.E., Inc. would "... fund no more than $5,000,000 of working capital and/or negative cash flow ..." (PPM, p. 24). The plaintiffs argue that the trial court found that EAB knew that C.E., Inc. could not fulfill its funding commitment. They claim that this knowledge constituted fraud.
In addition to the above statement in the PPM regarding a capital commitment, the PPM also specifically described the risk of C.E., Inc. becoming unable to make funds available to C.I., Ltd. This risk is described on page 33 of the PPM as follows:
"There can be no assurance that the General Partner [C.E., Inc.] shall have funds available to it or shall be able to make funds available to the Partnership [C.I., Ltd.] in either case sufficient in amount to satisfy the obligations of the Partnership."
At best, C.E., Inc.'s funding commitment was equivocal. Therefore, EAB did not obtain knowledge of fraud as a result of its review of the funding provisions in the PPM.
According to the trial court, EAB learned from the first supplement to the PPM that C.I., Ltd. had made investments which did not fall within the primary investment objectives stated in the PPM. The PPM stated that C.I., Ltd. intended to invest "primarily" in "existing Properties, such as apartment buildings and complexes, hotels, motels, office buildings and complexes and similar income producing properties." (PPM, p. 18). The PPM qualified the above representation in the following terms:
"It should be noted that although the Partnership currently intends to invest primarily in real property, the Partnership Agreement does not restrict the Partnership in any way from acquiring or investing in any other type of property or investment." (PPM, p. 18).
The supplement to the PPM stated that C.I., Ltd. had made eight investments. The largest investment was the purchase of the Bourbon Orleans Hotel in New Orleans for $12,867,300. The majority of the remaining investments consisted of interests purchased in other partnerships. Contrary to the findings of the trial court, EAB cannot be held to have known that these investments were inconsistent with the representations stated in the PPM. The largest of these investments, the Bourbon Orleans Hotel, fell squarely within the primary investment objectives of the PPM. With regard to the other investments, the PPM clearly stated that no guarantees could be given regarding the types of investments to be made by C.I., Ltd.
*736 The trial court attached significance to the fact that the March, 1981 audit of C.E., Inc. was "qualified" due to the existence of outstanding payables and receivables with its affiliated partnerships. The audit report contained the qualification since the scope of the audit did not extend to the affiliated partnerships. Such a qualification, standing alone, is not evidence of fraud on the part of EAB. Devito testified at trial that most syndicators would not have even provided audited financial statements.
The trial court found that since EAB knew that the proceeds of the EAB loan were to be used to pay off prior partnership loans, EAB had notice of an impropriety. The acknowledged reason for obtaining the EAB financing was to replace the Mercantile and FNB loans with lower interest financing. This purpose was legitimate and it was disclosed to the investors.[7] Therefore, EAB's knowledge of the proposed use of the proceeds was perfectly consistent with the interests of the plaintiff-investors.
As a final indication of EAB's bad faith, the trial court relied on the fact that at the signing of the loan agreement on March 15, 1982, the representatives of C.E., Inc. changed the guarantee provisions in the loan agreement. The guarantee provisions provided that the bank would receive guarantees from C.E., Inc. and Robert Jackson. Prior to the amendment the agreement provided:
"The bank will only call on the Guarantees after having drawn under the Letters of Credit."
On March 15, 1982, the C.E., Inc. representatives penciled in additional language. Following the change, the sentence stated:
"The bank will only call on the Guarantees after having drawn under the Letters of Credit, and only upon the failure or inability of the issuing bank to make payment under the terms of the Letters of Credit."
Regardless of the amendment, EAB was required to first attempt to draw under the letters of credit. It is not certain what effect the change had on the guarantee provisions. However, the investors' rights were not prejudiced since their letters were the first means of recourse for EAB in either case.
Based on our foregoing analysis of the facts relied on by the trial court, we find that there was no evidence of fraud or knowledge of fraud on the part of EAB. Therefore, the "fraud in the transaction" exception of R.S. 10:5-114(2) is not applicable to this case. The trial court's contrary holding was erroneous. Therefore, the court of appeal decision reversing the trial court in this respect must be affirmed.

OTHER DEFENSES
We now address plaintiffs' contention that EAB is subject to all of the defenses which could be asserted against C.I., Ltd., since EAB was a mere assignee of the letters of credit from C.I., Ltd. The trial court rejected this argument and found that EAB was entitled to the protected status accorded by the independence principle. We find that EAB was a beneficiary under the letters of credit in its own right and therefore it was not subject to defenses assertable against prior beneficiaries under different letters of credit.
At the time of the EAB loan, the investors were asked to have new letters of credit issued. The investors knew that the letters of credit were to be used to secure bank financing and that EAB would have the right to draw on the credit in case of *737 default.[8] As the new letters of credit were issued, the issuing banks simultaneously wrote EAB acknowledging that "... European American Bank & Trust shall be deemed for all purposes to be the beneficiary of the Letter of Credit."

REMAND
A final matter which we must address is plaintiffs' contention that they are entitled to a remand of this case for a trial on the merits. Plaintiffs argue that this case has merely been heard on the issue of whether they are entitled to a preliminary injunction. The parties did not stipulate that the courts' decision regarding the injunction would preclude a trial on the merits. Furthermore, plaintiffs argue that they have additional evidence to produce at a trial on the merits. Since plaintiffs have not waived their right to a trial on the merits, this case must be remanded to the trial court. To the extent that the court of appeal decision is inconsistent with this portion of our decree, it is reversed. Otherwise, the judgment of the court of appeal is affirmed.
Affirmed in part; reversed in part and remanded for trial on the merits, at plaintiffs' cost.
DENNIS, J., concurs with reasons.
WATSON, J., dissents and assigns reasons.
WATSON, Justice, dissenting.
Despite the voluminous record, briefs, and other filings, the issue is simply whether "fraud in the transaction" extends to EAB which was not a party to the transaction but knew about CE's fraud and laundered it by making the loan. The bank cannot be permitted to profit by accepting transfer of the letters of credit, making the loan (which soured within about two months) and then collecting on the letters. The trial court correctly enjoined payment.
I respectfully dissent.
NOTES
[1] The following parties are plaintiffs in these cases: Bennett Boyd Anderson, Jr., Carl Bauer, Richard W. Blackstone, Sr., Floyd Breaux, Marcel Bulliard, Shirley Covington, M.D., Terry A. Cromwell, M.D., Richard D'Aquin, Daniel G. Dupree, Roger Harris, Brian Heinen, John Howard, George Latiolais, William D. Long, M.D., Jewell Lowe, Robert Lowe, William McCray, M.D., Richard Melebeck, John Millette, Patrick Ottinger, James Parkerson Roy, Rodney Savoy, Isaac Seale, Stephen Searcy, Larry Sikes, William Stevenson, Jr., Mark Tompkins, Cecil D. Trahan and Norman J. Yentzen, Jr.
[2] The letters of credit involved in these consolidated cases were issued by Capital Bank & Trust Company of Baton Rouge, Southwest National Bank of Lafayette, Hub City Bank & Trust Company, Patterson State Bank, Commercial Bank & Trust Company, First National Bank of Lafayette, American Bank & Trust Company of Baton Rouge, American Bank & Trust Company of Lafayette, Guaranty Bank & Trust Company, First National Bank of Eunice, The Union Bank, Acadia Bank & Trust Company, Fidelity National Bank and Security First National Bank.
[3] American Bank & Trust Company, Baton Rouge issued letters of credit which secured letters of credit issued by American Bank & Trust Company, Lafayette. The injunction issued by the district court prohibited American Bank & Trust Company, Lafayette from honoring the letters of credit in favor of American Bank & Trust Company, Baton Rouge.
[4] R.S. 10:1-102(2)(c).
[5] R.S. 10:5-114 varies in two respects from the uniform version of 5-114. However, the differences are minor and have no bearing on the issues in this case.

In R.S. 10:5-114(1), "for sale or other contract" was omitted as being unnecessary. In R.S. 10:5-114(2), a reference to U.C.C. Articles 7 and 8 was omitted.
[6] Sztejn v. Henry Schroder Banking Corp., supra; Shaffer v. Brooklyn Park Garden Apartments, supra; O'Grady v. First Union National Bank, supra; Philadelphia Gear Corp. v. Central Bank, 717 F.2d 230 (5th Cir.1983); Dynamics Corp. of America v. Citizens & Southern National Bank, 356 F.Supp. 991 (N.D.Ga.1973); NMC Enterprises, Inc. v. Columbia Broadcasting System, Inc., 14 UCC Rep 1427 (N.Y.Supr.Ct.1974); United Bank, Ltd. v. Cambridge Sporting Goods Corp., 41 N.Y.2d 254, 392 N.Y.S.2d 265, 360 N.E.2d 943 (N.Y.App.1976); North American Foreign Trading Corp. v. General Electronics, Ltd., 67 A.D.2d 890, 413 N.Y.S.2d 700 (N.Y.Supr.Ct.1979).
[7] The investors received letters from C.E., Inc. which stated that:

"In order to obtain substantial savings for Combined Investments, Ltd., the general partner has decided to take advantage of an opportunity to transfer to another bank the loan to which your Letter of Credit is now pledged as collateral. Transfer of this loan (now held by Mercantile National Bank at Dallas) to European American Bank and Trust of New York will enable the partnership to decrease the interest rate on this loan by one and one-half (1½%) percent, and therefore to acquire an annual savings of interest in the approximate amount of $115,692." (Letter to the Anderson and Savoy Partnership).
[8] C.E., Inc. wrote each of the investors asking them to "renew" their letters of credit in order to effectuate the transfer of the loan from Mercantile to EAB.