**TEMTEX PRODUCTS, INC.**

v.

**CAPITAL BANK & TRUST CO.**

Civ. A. No. 81–842–A.

United States District Court,
M.D. Louisiana.

Nov. 21, 1985.

Charles E. Spedale, Gaudin, Olinde & Spedale, Baton Rouge, La., for plaintiffs.

Leon Gary, Jr., Gary & Field, Baton Rouge, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

Plaintiff, Temtex Products, Inc., a Tennessee corporation with its principal place of business in the state of Tennessee, has brought this action against defendant, Capital Bank & Trust Company of Baton Rouge, Louisiana, a banking corporation incorporated under the laws of Louisiana, having its principal place of business in the state of Louisiana. The amount in controversy exceeds $10,000, exclusive of interest and costs, and this court therefore has jurisdiction over the subject matter of this lawsuit by virtue of 28 U.S.C. § 1332.

This lawsuit was filed by Temtex against Capital Bank because of the bank's failure to honor drafts presented for payment under a letter of credit, pursuant to La.R.S. 10:5–114 and 5–115. Plaintiff seeks payment of the total amount of the drafts, $24,802.84, plus interest and costs. Capital Bank alleges fraud in the transaction, pursuant to La.R.S. 10:5–114, such that consent is vitiated and rescission of the contract is justified under La.Civil Code Articles 1953–1958. Trial was held November 4, 1985, and the court took the matter under submission in order to review additional testimony offered by the defendant by way of deposition. The court, having now considered that additional evidence, presents the following as its findings of fact and conclusions of law.

Plaintiff is the beneficiary of an irrevocable letter of credit in the amount of $25,000, issued by Capital Bank on March 11, 1981, for the account of its customer, The Fireplace Shop of Baton Rouge, Inc. The letter of credit provided that Capital Bank would honor drafts presented to it by Temtex, up to the aggregate amount of $25,000, on condition that the drafts be accompanied by a ninety (90) day old in-voice in an unpaid status. Temtex was a supplier of fireplace components to The Fireplace Shop and had requested the letter of credit as additional security for its extension of credit to The Fireplace Shop. Following negotiations between the owner of The Fireplace Shop, Mr. Willard Dugas, and Mr. Allie Pogue, an officer of Capital Bank, Ms. Andrea LeClerq issued the letter of credit. Temtex had been holding shipment of several orders to The Fireplace Shop and, upon receipt of the letter of credit, those orders were shipped and The Fireplace Shop of Baton Rouge was invoiced for the shipments. When payment was not forthcoming within ninety (90) days, Temtex presented the four invoices totalling $24,802.84, to Capital Bank for payment under the letter of credit. On August 21, 1981, Capital Bank refused to pay the drafts, noting on its Collection Advice that the account was in bankruptcy and that the drafts were disputed.

Capital Bank claims that it relied on representations made to it by Mr. Larry Smith, the Temtex controller, when making its decision to issue the letter of credit. The owner of The Fireplace Shop, Mr. Dugas, spoke with Mr. Allie Pogue and Ms. Andrea LeClerq, requesting the letter of credit from the bank. On December 2, 1980, Ms. LeClerq telephoned Mr. Smith at Temtex and asked for information concerning the status of The Fireplace Shop account. There is some dispute concerning the scope of Ms. LeClerq's inquiry; she indicated that she asked about the overall financial condition of The Fireplace Shop accounts, whereas Mr. Smith insists that the conversations concerned only the Baton Rouge location of The Fireplace Shop and that his responses were directed to that more limited inquiry. At any rate, during several telephone conversations between Ms. LeClerq and Mr. Smith prior to the issuance of the letter of credit, Mr. Smith informed Ms. LeClerq that The Fireplace Shop was making regular, albeit slow, payments on its account with Temtex and that Temtex was satisfied with its financial relationship

with The Fireplace Shop of Baton Rouge and with Mr. Willard Dugas.

It is clear from the evidence presented at trial that Mr. Smith did not volunteer any significant negative financial information concerning the Baton Rouge location of The Fireplace Shop, although in October, 1980, he had received a financial statement which showed that as of August 31, 1981, the business was experiencing a net loss for the year and that liabilities exceeded assets. Further, in October, 1980, Mr. Smith had been told by Mr. Garrett, a former co-owner with Mr. Dugas, as well as Dugas himself, that Mr. Garrett would try to put the Baton Rouge Fireplace Shop in involuntary bankruptcy. Mr. Smith explained the omission of this information, stating that Temtex was still receiving substantial payments on The Fireplace Shop of Baton Rouge account and he had no reason to repeat the casual remark made to him. Between July, 1980 and December, 1980, Temtex had shipped $93,000 worth of merchandise, of which $78,000 had been paid by the time of Ms. LeClerq's first telephone call. Mr. Smith further indicated that between January and March, 1981, some $56,000 of additional merchandise was shipped to The Fireplace Shop of Baton Rouge and that, during that period prior to the issuance of the letter of credit, an additional $55,000 was paid by The Fireplace Shop on its account. Mr. Smith stated that he did not put much stock in Mr. Garrett's "off-the-cuff" comment concerning involuntary bankruptcy, particularly since nothing had come of the threat and no efforts had been made by Mr. Garrett to have Temtex join any other creditors in taking such a step.

The Baton Rouge operation was the first of four Fireplace Shop entities which were established and operated by Mr. Dugas and Mr. Garrett between 1976 and 1981. The two men were partners in D & G Partnership and were co-owners of fireplace shops in Baton Rouge, Lafayette, New Orleans and Bossier City. Of the four entities, by late 1980, the New Orleans facility had been liquidated and the Lafayette and Bossier City operations could no longer meet their obligations to Temtex; only the Baton Rouge location was still conducting business on a regular basis. The co-owners/partners had fallen out with each other and as a result, Mr. Garrett and his wife had revoked their personal guarantees to Temtex which had previously secured The Fireplace Shop obligations. In turn, Mr. Dugas and his wife revoked their personal guarantees as to The Fireplace Shop in Lafayette, but continued to be personally obligated on the debts of The Fireplace Shop of Baton Rouge. In early 1981, while negotiations were still proceeding concerning the letter of credit, Temtex turned over the Lafayette and Bossier City Fireplace Shop accounts to a collection agency. On March 13, 1981, two days after the issuance of the letter of credit, Temtex's attorney filed suit against The Fireplace Shop of Lafayette, Inc. for approximately $28,000. (Eventually, in October, 1981, a similar suit was filed by Temtex against The Fireplace Shop of Bossier City, Inc., for approximately $70,000.) Because of the revocation of the Garrett's personal guarantees in June, 1980, the credit limit of The Fireplace Shop of Baton Rouge, Inc. had been reduced by Temtex from $75,000 to $40,000, and additional security in the form of the letter of credit was requested from Mr. Dugas. Occasionally, shipments were held by Temtex until The Fireplace Shop paid any amounts past due over 60 days. Unknown to either Capital Bank or Temtex at the time the letter of credit was issued, Mr. Garrett's efforts had been successful and on March 4, 1985, a creditor's petition for involuntary bankruptcy of The Fireplace Shop of Baton Rouge, Inc. had been filed in the Middle District of Louisiana.

Mr. Smith explained that he did not discuss the financial condition of the other Fireplace Shop entities with Capital Bank because the only operation under consideration at that time was the Baton Rouge store. The evidence establishes that Capital Bank was involved in financing the Baton Rouge store and no other. Capital Bank did not do business with any of the other Fireplace Shop entities; Mr. Smith

limited his comments to the Baton Rouge operation because he was not asked about any other entities. Mr. Smith stated that Temtex had always supplied and billed the various locations as distinct and separate accounts. Despite the problems with the other locations, Temtex felt that the Baton Rouge store would continue as a going concern and had therefore continued to supply the Baton Rouge store with merchandise. Mr. Smith further testified that as of January 31, 1981, The Fireplace Shop account showed unpaid invoices in the amount of approximately $41,000, all of which was within 60 days, and that by February, 1981, all of this amount had been paid except for approximately $2000 (which was also later paid). Additional shipments were made by Temtex following those of March, 1981, represented by the drafts under the letter of credit. Some $29,000 worth of merchandise was shipped after that time and payments of $28,000 were received in March and $14,500 in April from The Fireplace Shop of Baton Rouge. According to Mr. Smith, this continuing activity was conducted by Temtex because of its belief that the Baton Rouge operation could meet its obligations.

The bankruptcy schedules of The Fireplace Shop of Baton Rouge, Inc. show that, at the time the letter of credit was issued, Capital Bank was by far the major creditor, having almost $500,000 in outstanding loans to The Fireplace Shop of Baton Rouge, Inc. In connection with those loans, Capital Bank received regular financial statements from Mr. Dugas and/or The Fireplace Shop of Baton Rouge. At the time the letter of credit was issued to Temtex, a similar letter of credit in the amount of $35,000 was outstanding to another Fireplace Shop supplier, Preway; this letter of credit expired by its terms on March 11, 1984, but was renewed by Capital Bank for $15,000 at that time. Capital Bank received the personal endorsement of Mr. Dugas as security for the letter of credit which was issued to Temtex. No additional credit check was conducted by the bank before issuing the letter of credit and whatever financial information was on

file within the bank's commercial loan department was not reviewed prior to the issuance of the letter of credit, although Ms. LeClerq testified that she knew about the outstanding loans and was aware of the bank's requirement for the submission of regular financial statements in connection with such loans. The only investigation conducted by the bank was by way of general discussion with Mr. Dugas concerning how business was going and the previously mentioned telephone conversations with Mr. Smith concerning the current status of the Temtex relationship with The Fireplace Shop of Baton Rouge. Mr. Dugas indicated during his deposition that he regularly submitted financial statements to Capital Bank, including the one dated August 31, 1980, which showed the depreciating financial condition of the Baton Rouge store. He also testified that he informed Mr. Pogue that in order to maintain the $40,000 credit limit with Temtex, a letter of credit would have to be issued as additional security. Mr. Dugas also stated that he knew of Mr. Garrett's threats to put the Baton Rouge store into involuntary bankruptcy and that he had informed Mr. Pogue of these efforts so that he could be aware of the situation. Mr. Dugas recalled that this information was communicated to Capital Bank in advance of the bankruptcy, possibly during the negotiations concerning the letter of credit; Mr. Pogue admits that Mr. Garrett's threats were discussed, but contends that the discussion occurred after the bankruptcy had already been filed. Mr. Dugas further stated that he tried to keep both Temtex and Capital Bank informed concerning his overall financial condition.

■ It is clear from the evidence presented that plaintiff has established the facts necessary for recovery of the amounts submitted with the draft under the letter, unless the defendant's theory of "fraud in the transaction" has been sufficiently proven, such that rescission of the letter of credit is justified. The letter of credit transaction actually involves three contracts *East Girard Sav. Ass'n. v. Citi-*

zens Nat. Bank, 593 F.2d 598, 601 (5th Cir.1979). One is the underlying contract between the customer and the beneficiary, in this case, the sale of goods on credit between Temtex and The Fireplace Shop of Baton Rouge. The second contract is between the issuing bank and its customer, in this case between Capital Bank and The Fireplace Shop of Baton Rouge, whereby the bank agrees to issue a letter of credit in order to facilitate commercial transactions for its customer, usually with the understanding that the customer will maintain certain accounts with the bank or otherwise guarantee reimbursement to the bank. The third contract is between the issuer and the beneficiary, in this case, Capital Bank's agreement to pay Temtex when certain items are presented for payment, as long as those items meet the conditions established by the letter of credit. It is the third contract which is at issue in this litigation.

■ The letter of credit involved in this case is a "standby" letter of credit, in that the bank is not called upon to honor a draft until and unless, for some reason, the customer has failed to pay what it owes or otherwise has defaulted on its underlying contract with the beneficiary. As the Louisiana Supreme Court explained in the leading case on this subject, Cromwell v. Commerce & Energy Bank, 464 So.2d 721, 729 (La.1985), "... the event which triggers payment in the standby situation is a default on the underlying loan. The customer knows that the standby letter of credit will not be drawn on unless there is trouble—usually default on a loan made by the beneficiary." Obviously, by the nature of a "standby" letter of credit, the risk for the issuer is greater than when an ordinary "commercial" letter of credit is issued, since by definition, the letter is only intended to operate if the underlying contract has been breached. (See discussion in Cromwell, supra, pp. 728–9). Thus the contract between the issuer and its customer is fraught with some inherent risk for the issuer, which can only be obviated by other factors, such as amounts on deposit or personal guarantees, operating between the

issuer and its customer to lessen the risk. Philadelphia Gear Corp. v. F.D.I.C., 751 F.2d 1131, 1136 (10th Cir.1984).

The Louisiana statutes relied upon by both parties to this litigation are found in Title 10 of the Louisiana Revised Statutes, Section 5–101 et seq., also known as the Commercial Laws—Letters of Credit. That Chapter is substantially the same as corresponding provisions in the Uniform Commercial Code, § 5–101 et seq., and thus the experience of other states under these provisions is equally appropriate for interpreting the statutes. Generally, the statutes define the relationship between the issuer, the customer, and the beneficiary, (§ 5–103) and describe the rights and obligations of each of the parties. (§ 5–109, 5–114, 5–115) The defendant in this case has alleged that there was "fraud in the transaction," [§ 5–114(2) ] such that it was entitled to refuse payment of the drafts, because the plaintiff, by omitting certain material information concerning the financial condition of The Fireplace Shop of Baton Rouge, fraudulently induced it to issue the letter of credit. In the alternative, the bank argues that because certain credits available to Temtex were not credited to the account of The Fireplace Shop before the drafts were presented, that Temtex thereby overstated the amount due. The bank urges that this overstatement is also fraud in the transaction, in the nature of fraudulent documentation or breach of warranties. The defendant incorporates the Louisiana Civil Code provisions on fraud, Civil Code Articles 1954–1958; the Louisiana Supreme Court has noted that these provisions "would seem to require the same results reached in most of the fraud cases involving letters of credit." (Cromwell, supra, at 734), and are therefore included in this court's analysis of the law.

The question presented to this court for consideration is a novel one, since the court is asked to decide whether "fraud in the inducement" vitiates the contract between the issuer and the beneficiary. There are generally two lines of cases discussing the

question of "fraud in the transaction," neither of which addresses this precise issue. One line of cases examines the situation in which the customer is alleging that it has been defrauded by the beneficiary in the underlying contract between customer and beneficiary. *Cromwell, supra,* is such a case, as are a number of the cases cited within it, leading the Louisiana Supreme Court to note that "Fundamentally, 'fraud in the transaction,' ... must stem from conduct by the beneficiary of the letter of credit as against the customer of the bank." *Citing Colorado National Bank of Denver v. Bd. of County Comm. of Routt County,* 634 P.2d 32 (Colo.1981) (*Cromwell, supra,* at 732). Additional examples from this line of cases are *Cappaert Enterprises v. Citizens & So. Intern.,* 486 F.Supp. 819 (E.D.La.1980), *KMW Intern. v. Chase Manhattan Bank, N.A.,* 606 F.2d 10 (2d Cir.1979), and *Enterprise Intern. v. Corporacion Estatal Petrolera Ecuatoriana,* 762 F.2d 464 (5th Cir.1985). In the matter before the court, there is no allegation of fraud in the underlying contract between the beneficiary (Temtex) and the customer (Fireplace Shop). The injunctive relief which is made available in the case of fraud in the transaction [§ 5–114(2)(b)] is structured for the protection of the customer and enables the customer to enjoin payment on a letter of credit when the underlying transaction was permeated by the fraud of the issuer, and none of the cases which have interpreted this provision have considered it as grounds for invalidating the contract between issuer and beneficiary. This court will not assign to these provisions the interpretation suggested by defendant.

The second line of cases does examine the contract between issuer and beneficiary, concluding in some instances that fraud in the documents justifies the issuer's dishonor of drafts. Cases discussing this issue include *Philadelphia Gear Corp. v. Central Bank,* 717 F.2d 230 (5th Cir.1983), *East Girard Savings Ass'n. v. Citizens Nat. Bank, supra,* and *Roman Ceramics Corp. v. Peoples Nat. Bank,* 714 F.2d 1207 (3d Cir.1983). Generally, the cases have relieved the issuer of liability under the letter of credit when the documents presented to it have been non-conforming to the terms of the letter of credit (*Philadelphia Gear*) or when the certification accompanying the documents is patently false, such as stating that invoices are unpaid when they were, in fact, paid (*Roman Ceramics*). The *Cromwell* case, *supra,* also discusses several cases in which the documents accompanying the draft were fabricated or forged, in which case the "fraud in the documents" justified nonpayment by the issuer.

■ These two lines of cases suggest that, as between the issuer and the beneficiary, the only proper analysis under Title 10 concerns the question of whether the documents and certifications submitted by the beneficiary to the issuer are genuine and conforming on their face to the terms of the letter of credit. The evidence in the matter before the court clearly establishes that the invoices which were submitted to the bank were genuine and that they were 90 days past due and were unpaid. Therefore, there was no "fraud in the documents" as the courts have interpreted that phrase. Capital Bank suggests that because Temtex and The Fireplace Shop had certain oral agreements for the payment of overriding royalties which allowed Temtex to apply credits to the amounts owed by The Fireplace Shop, that because Temtex did not offset the invoice amounts with those credits, the drafts fraudulently overstated the amounts due. Relying on the *Roman Ceramics* case, defendant argues that this "mis-allocation of funds" is a presentment of fraudulent documents. However, the *Roman Ceramics* case involved an agreement between the parties to credit certain payments to certain invoices; the payments were not applied in accord with the agreement and the beneficiary was attempting to get double payment on the invoices submitted with its drafts. There is no evidence before the court in the instant case to suggest that Temtex is attempting to obtain double payment on its invoices. Defendant's position

is based upon the pretrial deposition testimony of Mr. Smith that the credits due The Fireplace Shop had not been applied to the invoices before calling upon the letter of credit. At trial Mr. Smith testified that his deposition testimony was in error and that when all of these credits were finally applied to the indebtedness of The Fireplace Shop, there was still an outstanding balance owed to Temtex of some $39,000, well above the $24,802.84 claimed in this suit. The court is convinced that Mr. Smith's trial testimony is correct. The *East Girard* case, *supra,* clearly states that a letter of credit is independent of any set-off which might be available under ordinary contract law and that the issuer has a duty to honor the drafts when accompanying documents are genuine and conforming. The Fifth Circuit in *East Girard* would not allow the re-sale price of the property to be offset against the indebtedness which was secured by the "standby" letter of credit, even when that re-sale price exceeded the debt and the beneficiary had not suffered any actual loss by the bank's dishonor. The court noted that it was crucial to maintain the independence of the letter of credit from the underlying commercial relationship between the beneficiary and the customer. Otherwise the court would, in every case, be forced to review the underlying transactions in order to determine the actual loss, when the intent of the letter of credit is that the face amount not be augmented or diminished by extraneous proof. Applying these concepts to the instant case, the court finds that the invoices presented for payment satisfied the terms of the letter of credit in every way and that there was no "fraud in the documents" justifying non-payment.

Going beyond the two lines of cases which have discussed the types of situations in which fraud justifies non-payment under a letter of credit, and applying the principles of fraud defined in the Louisiana Civil Code, this court must still conclude that the facts in the instant case do not, by a preponderance of the evidence, show that a fraud was perpetuated by Temtex on Capital Bank. According to Civil Code Article 1954:

> Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.

> This exception does not apply when a relationship of confidence has reasonably induced a party to rely on the other's assertions or representations.

■ There is no evidence before the court to suggest that a "special relationship" existed between Temtex and Capital Bank which would have induced the bank to rely on any of the statements made to it by the Temtex controller. Moreover Temtex did not mislead the bank or give it any false information. The account was somewhat slow, but satisfactory, and that is what Mr. Smith told Ms. LeClerq. Further, it is clear that Capital Bank had available to it the same financial information that Temtex had regarding the deteriorating condition of The Fireplace Shop of Baton Rouge, including information about Garrett's threats, but for some inexplicable reason, chose not to review the information in its files, to conduct any further inquiry, or to demand additional security from its customer. Given these facts, the court concludes that there was no "fraud in the inducement" such that the letter of credit should be invalidated.

Accordingly, there will be judgment in favor of Temtex Products, Inc., and against Capital Bank & Trust Company in the amount of $24,802.84, together with legal interest and costs.