**GATX LEASING CORPORATION**

v.

**CAPITAL BANK & TRUST COMPANY.**

Civ. A. No. 85–69–B.

United States District Court,
M.D. Louisiana.

Sept. 28, 1988.

Frank M. Adkins, Bronfin, Heller, Steinberg & Berins, New Orleans, La., for GATX Leasing Corp.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, La., for Capital Bank & Trust Co.

## OPINION

POLOZOLA, District Judge.

GATX Leasing Corporation ("GATX") filed this suit against Capital Bank & Trust Company ("Capital Bank")[1] to recover $200,000.00 based upon Capital Bank's failure to honor a draft presented for payment under a letter of credit numbered 1434 ("LC # 1434") pursuant to La.R.S. 10:5–114 and 10:5–115. Capital Bank denied any liability on the GATX claim and also filed a counterclaim against GATX seeking recovery of $272,000.00 which Capital Bank paid to GATX on a draft presented for payment under a second letter of credit numbered 1433 ("LC # 1433"), also issued to GATX as beneficiary.

The claims involved in this case arose out of certain transactions between Capital

---

1. After this lawsuit was filed, Capital Bank & Trust Company ("Capital Bank") was closed. The Federal Deposit Insurance Corporation ("FDIC"), in both its corporate capacity and its Receivership capacity, was substituted as the interested party in prosecuting the claims made herein and in defending the claims made against the bank. For purposes of clarity, the Court will refer to Capital Bank rather than the FDIC in this opinion.

Bank, GATX, and their mutual debtor, Offshore Mud Movers, Inc. ("OMMI"). During the early 1980's, both Capital Bank and GATX entered into multimillion dollar financing transactions with a group of affiliated entities engaged in various aspects of the oilfield service industry which were owned by a holding company, Garber Industries, Inc. ("Garber").

In early 1982, a 173–foot supply vessel, "Offshore Mud 201" ("OM 201") was constructed for OMMI and paid for through interim financing provided by Capital Bank. Capital Bank received a Preferred Ship Mortgage on the OM 201 in order to secure payment of the interim financing which it provided to OMMI. GATX subsequently advanced $3,472,000.00 in satisfaction of Capital Bank's Preferred Ship Mortgage, took title to the OM 201, and leased the OM 201 back to OMMI under an agreement styled "Bareboat Charter Party" ("Charter").

Shortly before the execution of the Charter, a marine survey of the OM 201 was obtained which set the value of the OM 201 at $3,200,000.00 creating a value deficiency of $272,000.00. On May 27, 1982, OMMI requested Capital Bank to issue LC # 1433 in favor of GATX, in the amount of $272,-000.00.[2]

Prior to the time the Charter was signed between GATX and OMMI, a preclosing conference was held at GATX's office in Houston, Texas. Present at this meeting were James Kaylor, representing GATX, and Richard Gillette and John Ab Boatner, who represented OMMI and its entities. Gillette was the Treasurer of Garber, OMMI's parent company, and Boatner was OMMI's attorney. At this conference, it was discovered that the transaction would cause a technical default with respect to

debt-equity ratio requirements set forth in the loan agreements between OMMI, entities affiliated with OMMI, and Chemical Business Credit Corporation ("Chemical"). OMMI's loan agreements with Chemical placed a ceiling upon the total aggregate debt which OMMI and its affiliates could incur in proportion to their total assets. The Charter would have had the effect of making the total debt higher than the Chemical loan agreements permitted in proportion to the total assets.

Because of this problem, Gillette placed a telephone call to Chemical during the conference to determine whether Chemical would grant a waiver of the technical default. After completing the telephone call, Gillette represented to Kaylor that the representative at Chemical stated that in all likelihood there would be no problem in obtaining a waiver of debt-equity ratio default from Chemical, but that the representative did not have the authority to grant such a waiver.

After further discussion at the preclosing conference, it was agreed between GATX and OMMI that OMMI would provide a second letter of credit in the amount of $200,000.00. The parties further agreed that GATX would return the letter of credit to OMMI in the event OMMI could secure a written waiver, in a form and substance satisfactory to GATX, from Chemical with respect to the technical default that would be occasioned by the closing. Amendment No. 1, which reflects this agreement to the Charter, was prepared for the closing.[3]

During the preclosing conference, Gillette also telephoned Eugene Farrell, OMMI's loan officer at Capital Bank, and discussed with him the technical default and OMMI's agreement to provide GATX with a second letter of credit. On or about

**2.** This letter of credit was to remain in full force and effect until (i) the fifth anniversary of the delivery date or (ii) such time (but not earlier than one year from the delivery date) as Offshore Mud Movers, Inc. ("OMMI") delivered a new survey to GATX Leasing Corporation ("GATX") which showed the fair market value of the vessel to be at least equal to the capitalized cost. The return of the letter of credit to OMMI was conditioned upon there not having

occurred an Event of Default which had not been waived or cured.

**3.** OMMI, GATX and Capital Bank contemplated that the waiver of technical default agreed upon between OMMI and GATX as a condition of the release of the $200,000.00 letter of credit, LC # 1434, could be contained in a formal, written waiver, a renegotiated loan agreement, or any other document.

May 27, 1982, LC #1434 was issued to Capital Bank in favor of GATX in the amount of $200,000.00.

GATX furnished the following text to Capital Bank and required it be inserted in LC #1433 and LC #1434. The language is identical except for the amount:

By order of our client, Offshore Mud Movers, Inc., we hereby open our Clean Irrevocable Letter of Credit No. 1434 in your favor for an amount not to exceed the aggregate of U.S. [$200,000.00 (LC #1434); $272,000.00 (LC #1433)] effective immediately and expiring at our office at our close of business on May 27, 1983.

Funds under this Letter of Credit are available against your sight draft(s) on us, mentioning thereon our Credit No. 1434, accompanied by your signed written statement to the effect that Offshore Mud Movers, Inc. has failed to comply with the terms and conditions of one certain Bareboat Charter Party, dated May 14, 1982 between Offshore Mud Movers, Inc. and GATX Leasing Corporation.

It is a condition of the Letter of Credit that it will be automatically extended for periods of one year from the then relevant expiry date, but in no event to extend beyond May 27, 1987. If thirty (30) days prior to the relevant expiry date we notify you by registered mail that we elect not to extend this Letter of Credit, you may draw your one sight draft on us for an amount not to exceed the unused balance of the Letter of Credit, mentioning thereon our Credit No. 1434, accompanied by your signed statement to the effect that Offshore Mud Movers, Inc. has failed to comply with the terms and conditions of one certain Bareboat Charter Party, dated May 14, 1982 between Offshore Mud Movers, Inc. and GATX Leasing Corporation.

OMMI and GATX closed the Charter agreement in Morgan City, Louisiana on May 27, 1982 when representatives of OMMI and GATX executed the Charter and other documents related to the Charter. On the same day, a representative of Capital Bank delivered LC #1433 and LC #1434 to the GATX representatives and released Capital Bank's Preferred Ship Mortgage on the OM 201. OMMI and GATX agreed and Capital Bank understood that LC #1434 would remain in effect only until a written waiver was granted by Chemical of the technical default created by entering into the Charter at which time GATX would return LC #1434.

The waiver was not obtained from Chemical, and in late 1983, OMMI went into payment default on the Charter and on its lending transactions with Chemical, Capital Bank and other major creditors. Beginning in late 1983, the Garber entities attempted to negotiate "workout" agreements with Capital Bank, GATX and Chemical.

Between May 28, 1984 and August 30, 1984 GATX received a copy of an agreement styled "Act of Consolidated Loan Agreement" dated May 21, 1984 between Garber entities and Chemical's successor in interest. GATX, OMMI and affiliated Garber entities entered into an agreement on December 1, 1984, styled "Agreement of Lease Termination and Financing Restructuring."

On December 20, 1984, GATX presented Capital Bank with two sight drafts drawn on Capital Bank. One draft was in the amount of $272,000.00 and referred to LC #1433. The second draft was in the amount of $200,000.00 and referred to LC #1434. Both drafts were accompanied by a written document executed by George R. Price, Vice President and Treasurer of GATX with the following words typed thereon: "Offshore Mud Movers, Inc. has failed to comply with the terms and conditions of one certain Bareboat Charter Party dated May 14, 1982, between Offshore Mud Movers, Inc. and GATX Leasing Corporation." On December 27, 1984, Capital Bank paid $272,000.00 to GATX in response to GATX's draft referencing LC #1433. However, Capital Bank refused to pay any money to GATX on its draft referencing LC #1434.

Capital Bank contends that it properly denied payment to GATX on LC #1434 for

the following reasons which are based on Louisiana law:

(1) GATX breached its presentation warranties to Capital Bank. La.R.S. 10:5–111.

(2) GATX presented fraudulent documents to Capital Bank. La.R.S. 10:5–114.

(3) GATX breached its obligation under Louisiana law of good faith.

(4) LC # 1434 does not constitute an enforceable obligation of Capital Bank because Capital Bank's consent is vitiated by error. La.Civ.Code Ann. arts. 1949–1950.

Capital Bank argues that LC # 1434 had been issued to secure GATX against one particular contingency—an acceleration by Chemical on its Garber loans due to the debt-equity ratio default caused by OMMI entering into the Charter. Capital Bank asserts that this contingency never occurred. In response to Capital Bank's arguments, GATX contends that as of December 20, 1984, none of the conditions for the release of the letter of credit had occurred, nor had the letter of credit expired by the passage of time. GATX also contends that the letter of credit was irrevocable, transferable and payable upon presentation by GATX to Capital Bank of a clean sight draft with a statement showing that OMMI was in default of its obligations under the Bareboat Charter. Finally, GATX states that there were no other conditions for payment.

A letter of credit is a commitment on the part of the issuing bank that it will pay a draft or demand for payment presented to it under the terms of the credit. Typically three separate and distinct contracts are involved: [4]

(1) The contract of the bank (Capital Bank) with its customer (OMMI) under which the bank agrees to issue the letter of credit to the beneficiary (GATX);

(2) The underlying contract between the customer and the beneficiary which results in the letter of credit issuance;

(3) The letter of credit itself which is a contract between the issuing bank and the beneficiary under which the bank agrees to pay the drafts under the letter of credit and presented to it by the beneficiary if they are accompanied by the requisite documents.

The letter of credit is separate and distinct from the underlying contractual transaction between the issuing bank's customer and the beneficiary. Therefore, the issuing bank's duty to honor drafts presented for payment is dependent only on the terms and conditions of the letter of credit and not on the underlying contract between the bank's customer and the beneficiary.[5] Because a letter of credit and the underlying contract are completely separate, the issuer may not use the terms of the underlying transactions as a defense or amplify the terms of the credit unless the letter of credit expressly incorporates its terms.[6]

The letter of credit involved in this case is a standby letter of credit. A standby letter of credit has been used extensively to secure financing for business ventures. It was used in this case to finance an offshore vessel. Such uses were explained in *Cromwell v. Commerce & Energy Bank*,[7] wherein the Louisiana Supreme Court stated:

There are several reasons why lending banks find it desirable to utilize letters of credit to secure the repayment of loans. First, the credit transfers the responsibility of payment from the customer to the issuing bank. Thus, the lending bank is assured payment unless the issuing bank becomes insolvent. Second, the credit is thought to offer an expeditious means of obtaining payment after default on a loan. Upon default, the lending bank merely submits affidavit evidence that the default occurred, and it may then draw on the standby letter of credit.

---

**4.** *East Girard Sav. Ass'n v. Citizens Nat'l Bank and Trust*, 593 F.2d 598, 601 (5th Cir.1979).

**5.** La.R.S. 10:5–109; *Philadelphia Gear Corp. v. Central Bank*, 717 F.2d 230, 235 (5th Cir.1983).

**6.** *Philadelphia Gear Corp..*, 717 F.2d at 237.

**7.** 464 So.2d 721, 729 (La.1985).

La.R.S. 10:5–114(2) provides three instances when an issuing bank may decline to pay under a letter of credit even though the documents presented to it facially comply with the terms of the letter of credit. These include:

(1) A required document does not in fact conform to the warranties made on negotiation;

(2) The document is forged or fraudulent; and

(3) There is fraud in the transaction.

La.R.S. 10:5–111 further provides that: [T]he beneficiary by ... presenting a documentary draft or demand for payment warrants to all interested parties that the necessary conditions of the credit have been complied with. This is in addition to any warranties existing under the law.

Relying on the last sentence of section 5–111, Capital Bank argues that letters of credit, as with other contracts, must be performed in good faith.[8]

Capital Bank's case is primarily based on the assertion that there were agreements between and among the parties, other than the agreements contained in the written documents. In particular, Capital Bank argues that there was an agreement which provided that GATX would be entitled to draft under LC # 1434 only if Chemical called its Garber loans because of the debt-equity default, thereby collapsing Garber and causing a default under the Charter. The Court finds that the evidence presented at trial does not support such a finding. The testimony of Gillette, Kaylor and Farrell do support a finding that the Charter and letter of credit reflect the agreements of the parties.

During the trial there was extensive testimony about the conversations between Gillette and Farrell during the preclosing conference held in Houston, Texas. Some evidence was presented that it was possible this conversation was held by way of speaker-phone or telephone conference but no one could specifically recall this fact. No evidence was presented to establish that Farrell spoke to anyone representing GATX to formulate any type of bilateral agreement. Capital Bank has failed to show there was ever any understanding between GATX and the bank to change the unambiguous terms and conditions of the letter of credit or to merge the Bareboat Charter and its amendment into the letter of credit.

The testimony further reveals that Farrel did not agree to issue the letter of credit at the time of the conversation with Gillette during the preclosing conference. It was not until after receiving GATX's proposed text of the letter of credit and after Farrell added additional language to the letter of credit that Capital Bank finally issued LC # 1434.

The Fifth Circuit Court of Appeals, when faced with a similar argument, held in *East Girard Sav. Ass'n v. Citizens Nat'l Bank and Trust*[9] as follows:

Any ambiguity in a letter of credit must be resolved against the party drafting it. (citations omitted) [The bank] attempts to escape this rule of construction by arguing that the parties intended that [bank] be liable on the letter of credit only if proof of [corporation's] default were presented. We reject this argument. An issuer's liability on a letter of credit is controlled solely by the terms of that letter.

[T]he bank must pay when the terms of the letter of credit are fully complied with. Thus, a bank must use the utmost care in drafting its letter of credit. (citation omitted) Banks are presumed to be cognizant of prevailing commercial practices in transacting their business. (citation omitted) When a bank eschews those practices, it does so at its own peril. If [the bank] desired that it be liable only upon [the corporation's] default, it should have made default an express condition of the letter of credit. [The bank's] only remedy is against [its customer].

---

**8.** La.Civ.Code Ann. art. 1983; *Makofsky v. Cunningham,* 576 F.2d 1223, 1226 (5th Cir.1978).

**9.** 593 F.2d at 602–603.

The Court finds that *East Girard* is applicable to the facts of this case. Although GATX provided an example of a letter of credit with text which would be acceptable to GATX, it is clear Capital Bank had the full opportunity to consider the matter and obtain legal advice and drafting assistance from its attorneys. Capital Bank also had the opportunity to include whatever terms or conditions it felt necessary to protect its interest or reflect its understanding of Gillette's representations. In fact, Capital Bank did add language to the letter of credit, but not the language which reflects and supports the arguments it now makes to the Court.

■ Capital Bank further contends that GATX presented fraudulent certifications to Capital Bank and attempted to perpetrate a fraud on Capital Bank. In *Temtex Products, Inc. v. Capital Bank & Trust Co.*,[10] the Court analyzed two lines of cases dealing with fraud in letter of credit cases. The first type of case deals with the question of "fraud in the transaction." *Cromwell, supra* is such a case. In *Cromwell,* the Louisiana Supreme Court noted that "[f]undamentally, 'fraud in the transaction' ... must stem from conduct by the beneficiary ... as against the customer of the bank."[11] In *Temtex,* the Court noted that the cases dealing with this defense have refused to consider it as grounds for invalidating the contract between issuer and beneficiary.[12] Furthermore, the Court must emphasize that there is no evidence of fraud in this case on the part of GATX against its customer, OMMI.

■ A second line of cases examines the contract between issuer and beneficiary. These cases conclude that, in some instances, "fraud in the documents" justifies the issuer's dishonor of letters of credit. However, as between issuer and beneficiary, the only proper analysis concerns the question of whether the presentation doc-uments are genuine and conforming on their face to the terms of the letter of credit.[13]

The Court finds that there are no documentary requirements in the letter of credit issued by Capital Bank which were not met by GATX. There is also no evidence of fraud on the part of GATX against Capital Bank.

Banks have on occasion attempted to avoid paying letters of credit on the ground that they were fraudulently induced to issue the credits. The jurisprudence has consistently held that the letter of credit will be strictly construed against its issuer.[14] The Court in *Temtex* noted that the Civil Code provides in Article 1954:

Fraud does not vitiate consent when the party against whom the fraud was directed could have ascertained the truth without difficulty, inconvenience, or special skill.

This exception does not apply when a relation of confidence has reasonably induced a party to rely on the other's assertions or representations.

■ Therefore, there must exist a "special relationship" between the issuer and the beneficiary before the issuing bank is entitled to rely on the circumstances of the underlying transaction or those surrounding the issuance of the credit. No evidence was presented to create any special relationship between GATX and Capital Bank. Relying on these facts, the Court concludes there was no evidence of fraud which would cause this Court to hold that LC # 1434 should be invalidated.

■ Alternatively, Capital Bank raises the affirmative defense of error. Under La.Civ.Code Ann. art. 1949, error vitiates consent "when it concerns a cause without which the obligation would not have been incurred and that cause was known or should have been known to the other party."

---

10. 623 F.Supp. 816 (M.D.La.1985), aff'd 788 F.2d 1563 (5th Cir.1986).

11. *Cromwell,* 464 So.2d at 732.

12. 623 F.Supp. at 821.

13. *Temtex,* 623 F.Supp. at 821.

14. *United States v. Sun Bank of Miami,* 609 F.2d 832, 833 (5th Cir.1980); *East Girard Sav. Ass'n.,* 593 F.2d at 602.

Relying on the testimony of Eugene Farrell, Capital Bank argues that in issuing LC # 1434 it believed GATX had agreed Capital Bank would not be required to pay under LC # 1434 unless Chemical called its Garber loans because of the technical debt-equity ratio default caused by the execution of the Charter. However, a unilateral error will not result in the rescission of a contract unless the other party knew or should have known that the matter affected by the error was the principal cause why the party in error made the contract.[15]

James Kaylor, GATX's representative at the time the letter of credit was issued, testified neither he, nor any other GATX representative, ever thought the conditions for payment under the letter of credit were in question. GATX contends that the letter of credit was clear and unambiguous, and no negotiations had occurred between GATX and Capital Bank. Therefore, there was no reason to question Capital Bank's motive for issuing the letter of credit. The Court accepts the testimony of James Kaylor and finds that error did not vitiate consent under the facts of this case.

Finally, Capital Bank argues that the renegotiated loan agreement between Garber and Chemical's successor, Chem-Lease Worldwide, Inc., entered into on May 7, 1984 effectively waived the technical debt-equity default caused by OMMI entering into the Charter Agreement. Capital Bank argues that this agreement triggered the condition for the release of LC # 1434. However, Amendment No. 1 to Bareboat Charter Party provided that the release of the letter of credit would be triggered by:

> the delivery to Owner of a written waiver, in form and substance satisfactory to Owner, by Chemical Business Credit Corporation ("CBCC") of the existing technical default in respect to the leverage ratio requirements set forth in that certain Loan Agreement ... Upon such delivery of the waiver referred to above, Owner shall promptly return such Letter of Credit to Charterer for such disposition as Charterer may deem proper.

GATX argues that the renegotiated loan agreement between Garber and Chemical which temporarily waived existing "technical defaults," including debt-equity ratios, is not a "satisfactory waiver" as contemplated by the parties when they entered into the Charter. The Court agrees with GATX, and concludes that a temporary waiver, entered into after Garber had gone into payment default, is not "satisfactory" such as to trigger the release of the letter of credit.

Finally, Capital Bank rests its defense to LC # 1434 and its counterclaim to be reimbursed on LC # 1433 on the contention that its obligations on the letters of credit ceased to be effective obligations of the bank when GATX and OMMI entered into their "workout" agreement because that agreement novated the debt for which the standby letters of credit were to secure. The Court finds that the GATX/Garber "workout" agreement did not constitute a novation. The clear language and intent of the workout agreement was to preserve—not extinguish—OMMI's obligations under the Charter. A novation requires a clear, unequivocal intention of the parties to extinguish the original obligation by the substitution of a new one. La.Civ.Code Ann. arts. 1879 and 1880. If any substantial part of the original performance is still owed, there is no novation. Mere modification of an obligation, without the intention to extinguish the obligation does not effect a novation.[16] Article 1881 of the Louisiana Civil Code expressly provides the execution of new writings are examples of modifications that do not effect a novation. Since the parties expressly retained the original obligations of the Charter and made particular reference to the obligations to maintain and permit the drawdown of the letters of credit, it is clear that a novation did not occur under the facts of this case.

In summary, the Court finds that Capital Bank had no legal or factual basis to dishonor Letter of Credit No. 1434 or to recov-

---

**15.** See comment (d), Louisiana Civil Code Article 1949.

**16.** La.Civ.Code Ann. art. 1881.

er the money paid to GATX under Letter of Credit No. 1433.

Therefore, the Court finds that judgment should be entered in favor of GATX Leasing Corporation and against Capital Bank & Trust Company in the sum of Two Hundred Thousand ($200,000.00) Dollars, together with interest on that amount from December 20, 1984 until paid, and all costs of these proceedings.

Judgment shall also be entered dismissing the counterclaim of Capital Bank & Trust Company with prejudice at its costs.