600 So.2d 761 (1992)
BLACK COLLEGIATE SERVICES, INC.
v.
Alfonso M. AJUBITA, et al.
No. 91-CA-0718.
Court of Appeal of Louisiana, Fourth Circuit.
May 14, 1992.
Rehearing Denied July 15, 1992.
*762 John Gregory Odom, Thomas J. Cortazzo, Lamothe, Hamilton & Odom, New Orleans, for plaintiff/appellant.
James A. Burton, Lloyd N. Shields, Charles C. Coffee, Simon, Peragine, Smith & Redfearn, New Orleans, for defendant/appellant.
Before BARRY and WARD, JJ., and JAMES C. GULOTTA, J., Pro Tem.
BARRY, Judge.
Picayune Press Ltd. (P Press) acquired the right to produce the World's Fair official souvenir book and on April 13, 1983 contracted with Black Collegiate Services, Inc. (BCSI), a publishing company, to be its exclusive advertising representative. Mitchel Osborne, general partner of P Press, attempted to terminate the agreement less than five months after the contract was signed. On August 29, 1983 Picayune Publications, Ltd. (PP Ltd.), a partnership in commendam, was formed and BCSI's contract was assigned to it pursuant to an agreement indicated in PP Ltd.'s private placement memorandum. PP Ltd.'s general partner was Picayune Publishing Inc. (PP Inc.) whose president and sole shareholder was Osborne.
BCSI was not paid for its services and filed suit for breach of contract on September 29, 1983 against Osborne, his wife, Jean Stastny, and P Press. On November 6, 1985 BCSI stipulated in open court to the dismissal with prejudice of Osborne, his wife, and P Press and the addition of PP Ltd. and PP Inc., its general partner, as defendants to be cast in a consent judgment for $300,000. The transcript provides:
It is further stipulated on the record that in connection with the partnership agreement, that the limited partners, each unit of Limited partnership interests in terms of the partnership agreement had an exposure of twenty-five thousand dollars of which five hundred dollars was cash in front, and the remainder was in terms of a letter of credit, that against the letter of credit the limited partners had paid ten thousand, approximately ten thousand dollars each.
The $300,000 in solido consent judgment was signed November 18, 1985 and declared that Osborne, as president and sole shareholder of PP Inc. (general partner of PP Ltd.) on behalf of the limited partnership waived citation, accepted service, and substituted PP Inc. and PP Ltd. as defendants.
*763 According to BCSI's petition, by "December 31, 1984 various creditors of the limited partnership, including the plaintiff, had presented demands for payment which remained unsatisfied." BCSI attempted to collect on the consent judgment but PP Ltd. was insolvent because over $10,000 of each limited partner's letter of credit had been cancelled. On November 18, 1986 BCSI sued the limited partners[1] based on the consent judgment. Prior to trial BCSI settled with and dismissed Lee G. De-Brueys with prejudice. On the first day of trial BCSI settled with Southport Inc. (formerly Southport Construction Company) and Destrehan Partnership.
PP Ltd. filed an exception of prescription which was tried with the merits. PP Ltd.'s motion for summary judgment was denied. The trial court rendered judgment on February 8, 1990 holding the limited partners of PP Ltd. liable in solido to BCSI for $300,000 plus legal interest from September 29, 1983 but not to exceed a total of $449,500.
The trial court denied the limited partners' motion for a new trial as to their solidary liability and this Court granted a writ (90-C-1179). This Court vacated the denial as to solidary liability and remanded for entry of judgment against the limited partnership and each partner severally in the amount of his liability and reserving the limited partners' rights to appeal any other matter. On September 6, 1990 the trial court signed a revised judgment[2] to comply with the remand.
The limited partners[3] appeal and list nine specifications which are incorporated into five alleged errors:
1) In the conclusion that PP Ltd.'s partnership agreement authorized the general partner to bind the limited partners as individuals to the consent judgment (error # 1);
2) denial of the motion for summary judgment (error # 2);

*764 3) the conclusion that the limited partners' letters of credit were a cash contribution to PP Ltd.'s capital based on parol evidence and that expiration of the letters constituted an impermissible return of capital (errors # 3, 4, 5, 7 and 8);
4) in its denial of the exception of prescription and invocation of the doctrine of contra non valentem (error # 6);
5) in its failure to credit settlement amounts paid to BCSI (error # 9).
BCSI also appeals and argues that its recovery should not be limited to $449,500.

PRESCRIPTION

Limited Partners' Argument 4
The trial court's reasons for judgment correctly noted the significant dates on the prescription issue. BCSI filed suit against P Press and its president, Mitchel Osborne, for breach of contract on September 29, 1983, prior to expiration of the letters of credit. The suit was set for trial on November 6, 1985 and was settled by stipulation in open court that date. The consent judgment was signed November 18, 1985 and BCSI did not attempt to execute on that judgment until sometime thereafter. BCSI introduced its request for a writ of fieri facias and garnishment interrogatories filed April 11 and June 2, 1986 respectively. BCSI filed suit November 18, 1986, one year after the consent judgment.
Although the trial court invoked the doctrine of contra non valentem agere nulla currit praescriptio, the doctrine is not appropriate or necessary. BCSI sued one year after the consent judgment and only months after its attempt to collect on the judgment. BCSI's rights had not prescribed under any theory submitted by the parties.

CONSENT JUDGMENT

Limited Partners' Argument 1
The limited partners argue that Osborne, their general partner, did not have authority to bind them individually in the consent judgment. On November 6, 1985 Osborne, as sole shareholder of PP Ltd.'s general partner, PP Inc., waived citation, substituted PP Ltd. and PP Inc. as defendants and consented to a judgment of $300,000 in solido.
A consent judgment has binding force from the presumed voluntary acquiescence of the parties, not from adjudication by the court. Ritchey v. Azar, 383 So.2d 360 (La.1980). A consent judgment is a bilateral contract wherein parties adjust their differences by mutual consent and end the lawsuit with each party balancing the hope of gain against the fear of loss. La.C.C. art. 3071; Braning v. Braning, 449 So.2d 670 (La.App. 4th Cir.1984). A consent judgment may be annulled or rescinded for an error of fact or error of the principal cause of the agreement. Succession of Koch, 487 So.2d 635 (La.App. 4th Cir.1986), writ denied 489 So.2d 251 (La. 1986).
A consent judgment is a final judgment and any change, if warranted, must be effected according to law. Succession of Simmons, 527 So.2d 323 (La.App. 4th Cir.1988), writ denied 529 So.2d 12 (La. 1988). A party may sue to annul the judgment under La.C.C.P. arts. 2001 and 2002, file a motion for new trial, or file an appeal. Cheramie v. Vegas, 468 So.2d 810 (La.App. 1st Cir.1985), writ denied 470 So.2d 122 (La.1985).
Article 6.01 of PP Ltd.'s partnership provides that PP Inc. was the general partner with a 50 percent interest. Article 9.01 provides that the general partner has exclusive authority to manage and control the affairs of the partnership. The general partner's powers included entering into and executing contracts, buying and selling assets, dispersing capital and income of the partnership, hiring employees and consultants, controlling any matter affecting the rights and obligations of the partnership including the employment of attorneys, the conduct of any litigation and the settlement thereof.
The trial court correctly found that the general partner had the power and authority to settle the suit and to substitute the limited partnership in the consent judgment. *765 There was no timely attack on that judgment. The trial court correctly ruled that the consent judgment was binding on the limited partnership.

CAPITAL CONTRIBUTION

Limited Partners' Argument No. 3
The limited partners argue that the trial court incorrectly concluded that the letters of credit constituted a capital contribution to the partnership and their expiration (without setting aside a fund for creditors) was a prohibited return of capital. The partners contend that the partnership agreement is not ambiguous and the trial court should not have considered irrelevant evidence such as federal tax forms, parol evidence, and experts' testimony.
Article 6.02 of PP Ltd.'s partnership articles provides:
The names and municipal addresses of the Partners In Commendam, their contributions to the capital of this Partnership In Commendam, and the proportionate capital interest owned by each in this Partnership In Commendam are as set forth on Schedule A attached hereto and made a part hereof. Each Partner In Commendam shall make an initial capital contribution in the amount and under the terms set forth in the Subscription Agreement signed by him. Partners In Commendam contributions shall be for Partnership Interests (`Units') which may be purchased at a price of Twenty-Five Thousand ($25,000) Dollars Per Unit. A minimum purchase of one (1) Unit ($25,000) is required; however, the General Partner may accept a limited number of fractional Units. The purchase price for each Unit shall be payable as follows:
(1) $500 in cash, payable at the time of subscription;
(2) A Letter of Credit in the amount of $24,500, that will expire on December 31, 1984. The Letter of Credit shall be from a lending institution acceptable to the Partnership's Bank and the General Partner.
Schedule "A" to the Articles dated August 29, 1983 lists the names and addresses of 24 limited partners in one column, their contribution to capital in a second column, and their percentage of equity in the third column. The capital contribution of a limited partner who owned one unit was listed as: "$500 Cash and $24,500 Letter of Credit" for a 1.785% capital equity. The October 18, 1983 amended Schedule "A" increased the number of limited partners to 31 and listed their names with the same "$500 Cash and $24,500 Letter of Credit" capital contribution, but decreased the equity value for one unit to 1.4285%.
Article 3.02 states that the partnership "shall continue in existence until December 31, 1985, unless sooner terminated as provided herein." The June 13, 1983 private placement memorandum (PPM) relating to limited partnership units in PP Ltd. also noted the December 31, 1985 termination date.
PP Ltd.'s PPM states that the offering price per unit was $25,000. The capital contribution by limited partners is stated: "The Limited Partners shall pay the sum of $10,000 cash per Unit and deliver a Letter of Credit in the amount of $15,000...." The PPM was amended on July 25, 1983 to reduce the cash payment to $500 and the letter of credit to $24,500.
PP Ltd.'s loan request submitted to Hibernia National Bank specified:
1. We request a revolving line of credit in the amount of $857,000. This line of credit is to be secured dollar for dollar by letters of credit aggregating $857,000, to be provided by limited partners of the partnership from a bank and in a form acceptable to Hibernia.
2. The proceeds of the revolving line of credit are to be used as follows:
a. funding LWE advance payments in amount of approximately $400,000
b. providing operating capital during production/non-revenue period
c. securing initial production run of reduced quantity.
3. Upon printing of first run and conversion of advertising purchase orders to receivables, we request an additional line of credit based upon 70-80% of the value of the receivables.
*766 A form of the irrevocable letter of credit to be issued was provided in the PPM. It included as beneficiary the name and address of the lending institution (Hibernia National Bank). The form provided that the letter of credit would expire on December 31, 1984.
It was stipulated that one letter of credit for $24,500 issued by First National Bank of Jefferson Parish to Hibernia National Bank was an example of all letters of credit. The August 26, 1983 letter example was on the account of Dr. and Mrs. Francisco Colon and provides: "Partial drawings are permitted. The drafts must be accompanied by this letter of credit for the purpose of such endorsements being made thereon."
BCSI introduced a copy of a December 18, 1984 letter by Mitchel Osborne to all investors in PP Ltd. in which he states that $9,942.86 would be called on each limited partner's letter of credit to cover "all outstanding payables." Osborne said that nothing further would be needed. Osborne advised that Hibernia Bank made the draw on the letters and then sent them back to the issuing banks and declared: "As the letters will automatically be retired on December 31, 1984, the bank from which you obtained the letter will probably return the letter to you at that time." Osborne's December 11, 1984 letter to one of the limited partners noted that Osborne had authorized the draw on the letters on December 7, 1984. He noted that amount of the draw "does not leave a surplus based on our immediate financial commitments...." Osborne listed BCSI's lawsuit as one of the largest amounts due.
La.R.S. 10:5-103(1)(a) provides:
`Credit' or `letter of credit' means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this Chapter that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit shall clearly state whether it is revocable or irrevocable and in the absence of such statement shall be presumed to be irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.
An issuer is a bank or other person issuing a credit. La.R.S. 10:5-103(1)(c). A beneficiary of a credit is a person who is entitled under its terms to draw or demand payment. La.R.S. 10:5-103(1)(d). A customer is the person who causes an issuer to issue a credit. La.R.S. 10:5-103(1)(g). There are at least three parties in each letter of credit agreement: the customer, the issuer, and the beneficiary. First National Bank of Jefferson Parish v. Carmouche, 515 So.2d 785 (La.1987).
A letter of credit allows the seller to replace the customer's obligation to pay with a commitment of a bank to pay drafts. The letter of credit is separate and distinct from the underlying transaction. The issuer's duty to honor a properly documented draft is unrelated and independent of the underlying obligation. That concept is called the "rule of independent contracts" or "the independence principle" which is embodied in La.R.S. 10:5-114(1):
An issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract between the customer and the beneficiary....
In recent years a letter of credit has been extended beyond its traditional usage in conjunction with the sale of goods. A standby letter of credit is now utilized to secure bank financing for business ventures and it guarantees the repayment of a loan. The event which triggers payment in the standby situation is a default on the underlying loan. The letter will not be used unless there is trouble, such as the default on a loan made by the beneficiary. When the credit secures a loan, the lending bank is the beneficiary of the letter. The standby letter of credit is a unique financial device capable of accomplishing a variety of guaranty functions. Cromwell v. Commerce & Energy Bank, 464 So.2d 721 (La.1985). See also Note, Letter of Credit: Gold Bullion, 45 LA.L.REV. 927 (1985).
*767 The standby letter of credit acts as a "backup" when a customer defaults on an obligation. It functions like a guaranty. The customer's failure to pay prompts the beneficiary's call on the letter. A letter of credit differs from a guaranty in that the obligation of the guarantor depends upon the existence of a primary obligation on the part of the debtor or guarantor's principal running to the principal's creditor. The guarantor can often set up defenses that the principal debtor has against the creditor; however, the issuer of a letter of credit cannot do so. The letter of credit also differs from a guaranty in that the obligation of the guarantor cannot mature unless the principal debtor has defaulted. Under a letter of credit the issuer's obligation arises on proper presentment of documents. White and Summers, 2 Uniform Commercial Code 19:1-3 (3rd Ed.1988).
It is clear that the limited partners executed valid irrevocable letters of credit. The lending bank, Hibernia, called in $9,942.86 on each letter.
La.C.C. art. 2842 provides in pertinent part: "A partner in commendam may not receive, directly or indirectly, any part of the capital or undistributed profits of the partnership if to do so would render the partnership insolvent. If he does so, he must restore the amount received together with interest at the legal rate." Revision Comment 1980(b) declares: "Except as provided in this article, a partner in commendam cannot be forced to restore distributions he has received. For example, if a distribution were made at a time when the partnership was solvent, and the distribution did not result in insolvency, the creditors would not be able to compel restoration under this article."
A limited partnership in Louisiana is a popular business entity for highly capitalized ventures because it allows efficient use of available tax advantages and it also permits an investor to limit his liability to the amount of his capital. Because all losses which pass to the individual members retain their character as ordinary or capital gain or loss, the partnership in commendam often provides a tax shelter. Comment, The Partnership In Commendam: Tax Consequences and Business Risks, 36 LA.L.REV. 261 (1975).
Article 8.04 of PP Ltd.'s partnership articles provided:
A Partner In Commendam may not receive, directly or indirectly, any part of the capital or undistributed profits of this Partnership In Commendam if to do so would render this Partnership In Commendam insolvent. If a Partner In Commendam does so, he must restore the amount received together with interest at the legal rate.
PP Ltd.'s PPM discussed distribution upon termination:
Upon termination of the Partnership the General Partner shall liquidate the assets of the Partnership and distribute or apply the proceeds thereof in the following order of priorities: (1) to pay any debts and liabilities of the Partnership; (2) to establish any reserve which the General Partners deem reasonably necessary to provide for any contingent or unforeseen liabilities or obligations of the Partnership; (3) to the Partners for any loans made by them to the Partnership; and (4) to the Partners in the same proportion as their original contribution to the Partnership capital.
Article 6.04 of PP Ltd.'s articles state that a capital account shall be established for each partner which reflects all capital contributions, all items of partnership income allocated to such partner, all distributions made to the partner, and all items of partnership costs, expenses or losses allocated to the partner. It further states: "Each capital account shall be maintained in a manner corresponding to the capital of the Partners as reported on the federal income tax returns of the Partnership."
The PP Ltd.'s August 31, 1984 management report listed each limited partner's letters of credit as an asset. It was stipulated that the treatment of the limited partner's letters of credit was the same in other reports. BCSI also introduced a draft of PP Ltd.'s December 31, 1984 report which originally listed the limited partners' letters of credit as a current asset of $510,500, but *768 deleted that amount and showed a negative $166,754 as the partnership equity. The actual report did not list the $510,500 and showed the negative $166,754 as the partnership's total equity. Schedule M of Form 1065 shows PP Ltd.'s capital at the beginning of the year as $731,831. After an ordinary loss of $388,087 and withdrawals and distributions of $510,498, the capital account at the end of 1984 was a negative $166,754. The parties admitted copies of one of the limited partners' IRS schedule K-1 for 1983 and 1984, Partner's Share of Income, Credits, Deductions as representative of the others. Dr. Francisco Colon's 1983 form lists a $25,000 capital contribution and a loss of $4,009. His 1984 form has $20,991 in the capital account at the beginning of the year and an ordinary loss of $10,866.
The use of letters of credit as part of the capital contribution of a limited partner was discussed in Cromwell, 464 So.2d at 721. There, each partner put "at risk" for tax purposes $250,000 which only included $20,000 cash. Each limited partner signed a $30,000 non-interest bearing demand note and a $200,000 demand note secured by a $200,000 standby letter of credit. The Louisiana Supreme Court noted the highly leveraged terms of the capital contribution in order to secure a significant tax advantage. Id.
Here, the partnership's articles require each limited partner to execute a $24,500 letter of credit which would expire December 31, 1984. Art. 6.02 of PP Ltd.'s articles speaks of the limited partners' contributions to the capital, Schedule "A" attached to the articles listed both the cash and the $24,500 letter of credit in the contribution to capital column, then listed the percentage of capital interest for each limited partner. The amended PPM noted that a subscription could be made by the cash payment of $500 per unit plus the $24,500 irrevocable letter of credit. PP Ltd.'s August, 1984 management report listed the letters of credit as an asset.
Considering those documents, which were certainly relevant and admissible, this Court concludes that the cash and letters of credit constituted each limited partner's capital contribution. Long before the December 31, 1984 expiration date, BCSI filed suit for breach of contract and that suit was pending when the letters of credit expired and a number of PP Ltd.'s creditors were not paid. Osborne noted the lawsuit as one of the amounts due in a December, 1984 letter.
A limited partner may not receive (directly or indirectly) any part of the capital of the partnership if it renders the partnership insolvent. If a partnership in commendam does not force the limited partners to return the amount received, the creditors may proceed directly against the limited partner. La.C.C. art. 2842. In order for a limited partner's capital to be withdrawn from the partnership, the partnership must be solvent with no reasonable expectation of insolvency.
Two solvency tests are arguably applicable: the Louisiana Business Corporation Law tests solvency by whether the debtor is able to meet his obligations as they become due; the Uniform Limited Partnership Act tests insolvency by whether the aggregate dollar amount of the debtor's assets is less than the total dollar amount of his liabilities. Comment, An Examination of Louisiana Limited Partnership The Partnership in Commendam, 55 TUL.LA.REV. 515 (1981).
Mitchel Osborne's December 18, 1984 letter states that Hibernia Bank would make no further draw on the letters of credit. According to the PPM, in the distribution of assets the partners would receive their proportionate share of the original partnership capital after all liabilities were paid. A reserve was to be established to provide for any contingent or unforeseen liabilities and any loan to a partner was to be repaid before payment to the limited partners.
Considering that BCSI filed suit in September, 1983 for services rendered prior to the opening of the World's Fair, we conclude that capital contributions were improperly returned to the limited partners prior to the payment of debts or the establishment of a reserve to pay future liabilities. Pursuant to PP Ltd.'s loan request to *769 Hibernia, the money from the letters of credit was to be used for three purposes, two of which were to provide operating capital during the production/non-revenue period and to secure an initial production run of reduced quantity. BCSI's original suit for breach of contract was filed only months after the contract and prior to the World's Fair, so payment on BCSI's contract was a proper use of capital provided from the letters of credit.
We have not considered the testimony and parol evidence in reaching our conclusion. The documents clearly show that the irrevocable letters of credit constituted a part of each partner's contribution to capital.
The trial court correctly concluded that the return of capital to each limited partner "in the instant case, and under the peculiar circumstances of this cause [sic], prejudiced the rights of creditors of the Partnership, and therefore was in direct conflict with and violative of LCC Article 2842...."
The trial court in its revised judgment properly held each limited partner liable severally for the amount he contributed plus interest. Starting with the amount of the letter of credit, $24,500, less the amount drawn by Hibernia Bank, $9,942.86, a limited partner owning one unit was liable for $14,557 plus legal interest.

SUMMARY JUDGMENT

Limited Partners' Argument No. 2
In light of the above discussion, we conclude the trial court properly denied the limited partners' motion for summary judgment.

CREDITS

Limited Partners' Argument No. 5
The limited partners argue that they should be given credit for settlements prior to trial.
BCSI concedes that it received $32,000 which should be credited against the $300,-000 award. We amend the judgment to $268,000 plus interest.

MAXIMUM AMOUNT OF RECOVERY

BCSI's Argument No. 1
BCSI submits that the trial court erred by holding that its recovery is limited to $449,500. The limited partners acknowledge in their brief that there is no authority for a cap on post-judgment interest.
We amend the judgment to remove the $449,500 maximum.

CONCLUSION
The revised judgment is final as to the limited partners who did not appeal the judgment or abandoned their appeal.
The judgment limit of Four Hundred Forty-Nine Thousand Five Hundred Dollars ($449,500) is set aside.
The judgment is affirmed severally, against Alfonso M. Ajubita, F.E. Astilla, M.D., Manuel J. Astilla, Michael O. Babin, Richard L. Bagnetto, M.D., Bologna Exposition Trust, Francisco Colon, M.D., Ralph Deloney, Mr. and Mrs. Eugene Fischer, Carlos R. Gorbitz, M.D., Blaine Kern, Juan J. Labadie, M.D., Arthur McFatter, Otholino Remedios, M.D., and Jack C. Vaughn. Appellants are to pay all costs.
The judgment against the above defendants is reduced by the $32,000 settlement to Two Hundred Sixty-Eight Thousand Dollars ($268,000) plus interest.
In all other respects the judgment is affirmed.
AMENDED; AFFIRMED.
NOTES
[1] The limited partners named in BCSI's suit were: Alfonso M. Ajubita, F.E. Astilla, M.D., Manuel J. Astilla, Michael O. Babin, Richard L. Bagnetto, M.D., J. Buchanan Blitch, Ronald A. Blitch, Bologna Exposition Trust, Eduardo M. Camacho, CIG Exploration, Francisco Colon, M.D., Lee G. DeBrueys, Ralph E. Deloney, Destrehan Partnership, Mr. and Mrs. Eugene Fischer, Carlos R. Gorbitz, M.D., H & A Investments, Intermedia Advertising, Inc., Shirley Lee Jensen Trust, Blaine Kern, Juan J. Labadie, M.D., Henry LaRocca's Children's Trust, Rodney P. Le-Blanc, Arthur L. McFatter, Otholino Remedios, M.D., Southport Construction Company, Segismundo Z. Ureta, F.J. Valen, M.D., Jack C. Vaughn, Vincent Trust, and H.E. Waldrup. Lee DeBrueys, Destrehan Partnership and Southport Construction Company (now Southport, Inc.) settled with BCSI and were dismissed. Segismundo Z. Ureta died. BCSI deleted CIG Exploration, H & A Investments, Intermedia Advertising, Inc., Shirley Lee Jensen Trust, Vincent Trust and H.E. Waldrup.
[2] The revised judgment listed the following defendants and amounts:

Alfonso M. Ajubita $ 7,278
F.E. Astilla, M.D. $29,115
Manual [sic] J. Astilla $14,557
Michael O. Babin $14,557
Dr. Richard L. Bagnetto $14,557
J. Buchanan Blitch $14,557
Ronald B. Blitch $14,557
Bologna Exposition Trust through its $14,557
 trustee, Francis Bologna
Eduardo M. Camacho $14,557
Francisco Colon, M.D. $14,557
Ralph E. Deloney $14,557
Mr. & Mrs. Eugene Fischer $14,557
Carlos R. Gorbitz $14,557
Blaine Kern $14,557
Juan J. Labadie $14,557
Henry LaRocca's Children's Trust, $29,115
 through R.J. Skinner, trustee of credit
Rodney P. LeBlanc $14,557
Arthur L. McFatter $14,557
Otholino Remedios $14,557
F.J. Valen, M.D. $14,557
Jack C. Vaughn $ 7,278

[3] The following defendants appealed and are represented by the same counsel: Alfonso M. Ajubita, F.E. Astilla, M.D., Manuel J. Astilla, Michael O. Babin, Richard L. Bagnetto, M.D., Bologna Exposition Trust, Francisco Colon, M.D., Ralph Deloney, Mr. and Mrs. Eugene Fischer, Carlos R. Gorbitz, M.D., Blaine Kern, Juan J. Labadie, M.D., Arthur McFatter, Otholino Remedios, M.D., and Jack C. Vaughn. Limited partners will refer to these parties. Henry LaRocca's Children's Trust and Rodney LeBlanc appealed and each was represented by counsel but no appellate brief was filed and their appeals are deemed abandoned. We note that notification of orders for relief under 11 U.S.C. 362(a)(1) were filed in district court as to Eduardo M. Camacho and Ronald B. Blitch and their status was noted in the limited partners' motion for a new trial. Neither of those defendants appealed.